MAYHORN, APPELLANT *v.* PAVEY, APPELLEE.

(No. 82AP-121—Decided October 19, 1982.)

*Barkan & Neff Co., L.P.A.,* and *Mr. Frank J. Neff,* for appellant.

*Messrs. Lane, Alton & Horst* and *Mr. Jack R. Alton,* for appellee.

NORRIS, J. Plaintiff-appellant, Irene Mayhorn, appeals from a judgment of the Court of Common Pleas of Franklin County resulting from the granting of defendant-appellee's motion for a directed verdict at the close of all the evidence. The issue presented by the appeal is whether or not hypothetical questions posed by plaintiff's counsel to plaintiff's expert witness, and the expert's responses, resulted in sufficient evidence to warrant submission of plaintiff's case to the jury.

The case was filed by plaintiff as a wrongful death action based upon defendant's medical malpractice. Defendant, Charles W. Pavey, a doctor of medicine, was board certified in obstetrics and gynecology and attended plaintiff's pregnancy and her 1975 delivery, at Columbus' Riverside Methodist Hospital,

of a post-mature stillborn infant. Plaintiff contended that defendant had violated the standard of care he owed her in the management of her pregnancy by failing to test her for diabetes, by prescribing a drug for her use while not under medical supervision, and by failing to test the well-being of the fetus when it was suspected that hers was a post-term pregnancy.

Plaintiff's argument that defendant's conduct violated the standard of care owed by a physician in the practice of a specialty, and that his negligence in that regard was the proximate cause of the death of the fetus, was grounded upon the testimony of her expert witness, Edward J. Quilligan, M.D. His disagreement with defendant's management of plaintiff's case centered around his assertion that defendant should have conducted testing to discover if the pregnancy was in fact post-term and, if so, to detect if the fetus was in distress. He also took issue with a testing procedure utilized by defendant.

Defendant had prescribed buccal pitocin, a drug compound which stimulates uterine contractions, and had instructed plaintiff to take the drug at home. Defendant testified that his purpose in prescribing buccal pitocin was to determine if the pregnancy was post-term — if it was, the drug's use would produce contractions which would then develop into labor; but, if the pregnancy was not at term, then the drug's use would not produce contractions, indicating a miscalculation in the baby's delivery date.

Plaintiff testified that use of the first prescription of buccal pitocin caused slight but not hard contractions, and that use of the second prescription failed to produce any contractions.

Dr. Quilligan criticized defendant's having prescribed buccal pitocin for home use, in view of the danger that the oxygen supply to the fetus could be cut off if plaintiff's use of the drug produced extremely strong and frequent contractions.

Dr. Quilligan also criticized defendant for not having administered glucose tolerance tests to determine if plaintiff was diabetic since he asserted that mothers with diabetes experience a significantly higher incidence of still-births. On cross-examination, he admitted that the test would have had no effect on the well-being of the fetus if plaintiff was not diabetic.

Finally, Dr. Quilligan testified that, in managing what was a possible post-term pregnancy, defendant should have administered either a urinary estriol test or an oxytocin challenge test in an effort to determine if the fetus was full term and in good condition, or if it was in distress. As to the former test, Dr. Quilligan conceded on cross-examination that, in 1975, the test was the subject of legitimate controversy in the medical community concerning its effectiveness. He also testified that he did not know if Riverside Methodist Hospital, in 1975, had the sophisticated electronic equipment required for administration of the oxytocin challenge test, and that he did not know whether or not, in 1975, use of the test was sufficiently widespread so that it could be considered a standard of practice.

In response to hypothetical questions posed by plaintiff's counsel, Dr. Quilligan testified that in his opinion defendant did not provide plaintiff with the reasonable and proper standard of medical attention and care of a reasonable specialist in obstetrics and gynecology, and that had defendant not conducted himself in the manner with which Dr. Quilligan took issue, the fetus probably would not have died.

The hypothetical questions included no reference to plaintiff's having experienced only slight contractions after use of buccal pitocin, made no mention of whether or not plaintiff was diabetic, and did not include any information on the availability at Riverside Methodist Hospital, in 1975, of the equipment required to administer the oxytocin challenge test.

Plaintiff raises one assignment of error:

"It is prejudicial error for the judge in a medical malpractice action to grant a directed verdict against the plaintiff when the testimony by each party's expert witness, with respect to the defendant-doctor's negligence and the proximate cause of the death of plaintiff's stillborn child, is in direct conflict, and such conflict constitutes triable questions of fact to be decided by a jury."

In essence, plaintiff argues that Dr. Quilligan's testimony was of sufficient probative value to raise an evidentiary controversy concerning whether or not defendant was negligent and whether his negligence was the proximate cause of plaintiff's damages. The trial court's function in ruling on a motion for directed verdict does not involve any weighing of the evidence, nor is the court concerned with the credibility of witnesses. *Strother* v. *Hutchinson* (1981), 67 Ohio St. 2d 282, 284 [21 O.O.3d 177]. What is being tested by the motion is the legal sufficiency of the evidence to take the case to the jury. The "reasonable minds" test of Civ. R. 50(A)(4) required the trial court only to determine whether or not there existed any evidence of substantial probative value in support of plaintiff's allegations that defendant breached the duty of care owed her, and that his negligence proximately caused the death of the fetus. *Ruta* v. *Breckenridge-Remy Co.* (1982), 69 Ohio St. 2d 66 [23 O.O.3d 115].

In large measure, the issue in this appeal boils down to a question of the legal sufficiency of plaintiff's hypothetical questions to Dr. Quilligan, and of his opinion-answers to them. If these were fatally flawed, then the trial court was warranted in concluding that there was insufficient evidence of negligence and proximate cause to send the case to the jury.

Although we are here concerned with the weight to be given Dr. Quilligan's answers in view of the content of the hypothetical questions, and most reported opinions analyzing hypothetical questions are concerned with the admissibility of opinions rendered in response to these questions, an examination of the cases is relevant to our inquiry.

Usually, the purpose of the hypothetical question is to bring before the expert, for his opinion, facts of which he has no personal knowledge. *Scott* v. *Campbell* (1961), 115 Ohio App. 208 [20 O.O.2d 298], at 211. Another purpose is to satisfy the requirement that the facts upon which an expert witness bases his opinion must be disclosed to the trier of the facts; one method of making this disclosure is by the expert's responding to a hypothetical question which includes assumed facts. Evid. R. 705. The expert cannot base his opinion upon facts assumed in a hypothetical question unless evidence tending to establish them is admitted into evidence, either through other witnesses or through the expert testifying upon his own personal knowledge. Evid. R. 703; *Burens* v. *Indus. Comm.* (1955), 162 Ohio St. 549 [55 O.O. 436], paragraph one of the syllabus. See, also, *State* v. *Chapin* (1981), 67 Ohio St. 2d 437, 442 [21 O.O.3d 273]; *Kraner* v. *Coastal Tank Lines* (1971), 26 Ohio St. 2d 59, 60 [55 O.O.2d 68]. The purpose of the rules governing the assumed facts which underlie the hypothetical question and the opinion-answer is to insure that the trier of the facts is aware of the facts upon which the opinion rests, so that in the event the trier of the facts rejects these facts as not having been established by the evidence, it will then be warranted in rejecting the opinion also. See Giannelli, Ohio Evidence Manual (1982) 77, Section 703.04(a). See, also, *Springfield Gas Co.* v. *Herman* (1933), 46 Ohio App. 309, at 311.

Where there is conflict in the evidence concerning the existence of a fact which is material to the expert's forming an opinion, counsel propounding the hypothetical question is entitled to include as an assumed fact his version of the evidence

on the disputed fact. It is then for the trier of the facts to resolve the factual dispute and, depending upon its findings, to determine what weight it will give to the opinion-answer. *Haas* v. *Kundtz* (1916), 94 Ohio St. 238; *Community Traction Co.* v. *Wandtke* (1929), 32 Ohio App. 207; *Utility Coals, Inc.* v. *Fruehauf Corp.* (July 20, 1971), Franklin App. No. 71-28, unreported.

A different situation arises where there is uncontradicted evidence of a fact which is critical to the expert's formation of a reliable opinion but the hypothetical question does not disclose that fact to the expert, and so his opinion presumably is not grounded upon that fact, but nevertheless purports to resolve a critical issue in the case. The obvious danger is that clever trial counsel, through the omission, may present an unfair and inadequate picture to the expert, and the jury may give undue weight to the opinion without considering its faulty basis. While some courts have taken the position that the ability of opposing counsel to furnish the missing fact on cross-examination, or the authority of the trial judge to require the reframing of the hypothetical question, furnish sufficient safeguards against abuse (McCormick, Evidence [2 Ed. 1972] 34, Section 15), at least one Ohio case is cited for the proposition that Ohio courts incline toward the stricter view that hypothetical questions must fairly reflect facts established by the evidence and that in order to assure that a reliable opinion is given on an issue crucial to the case, all facts which would vitally affect the conclusion of the expert witness must be embraced in the hypothetical question. *Surman* v. *Ohio & Pennsylvania Oil & Gasoline Co.* (1962), 116 Ohio App. 453 [22 O.O.2d 292].

However, a reading of other opinions leads us to believe the majority and better view of the Ohio courts is one which favors admission of the opinion-answer, with consideration of the sufficiency of the factual content of the hypothetical question to be addressed as a factor in determining the weight to be given the opinion-answer. That view has been summarized by this court as follows:

"* * * A hypothetical question is improper only where it assumes facts not in evidence, unfairly reflects the facts in evidence, or omits facts in evidence so vital to the conclusion of the expert that the question manifestly fails to present the facts which it does include in their true and just relationship. Whether a hypothetical question is proper lies largely within the discretion of the trial court." *Utility Coals, Inc.* v. *Fruehauf Corp.*, *supra*, at 1320. See, also, *Manley* v. *Coleman* (1924), 19 Ohio App. 284, at 295.

The rationale for this more tempered view on admissibility is both practical and sound. Often, it is not possible to determine which facts are material to the conclusion of an expert witness until both direct examination and cross-examination have been utilized. Frequently, opposing counsel will have widely differing views of what facts are material to the opinion of an expert witness. And, since ascertaining what facts are important to an expert's opinion may itself be a matter for expert opinion, only the expert witness may be able to answer that question. In cross-examination, opposing counsel has the opportunity to ascertain whether a missing fact is important to the opinion of the expert or whether it will affect his opinion. If the expert concedes that his answer would have been different if an undisputed material fact in evidence had been included in the hypothetical question, that concession will tend to destroy the probative value of his prior opinion.

With this discussion in mind, we now move to a consideration of plaintiff's hypothetical questions and the probative value to be assigned Dr. Quilligan's opinion-answers.

First, as to plaintiff's contention concerning defendant's misuse of buccal pitocin, Dr. Quilligan's own testimony clearly indicates that any damage to the

fetus from plaintiff's use of buccal pitocin would have to be predicated upon her having had extremely strong contractions. The only evidence on the point was that plaintiff experienced only slight contractions. In the course of the hypothetical question, Dr. Quilligan was not asked to assume any fact concerning plaintiff's having experienced or not having experienced contractions. Since that was a fact critical to Dr. Quilligan's opinion on proximate cause, the absence of such a factual recitation renders the opinion of Dr. Quilligan on this point of no probative value.

Likewise, Dr. Quilligan testified that defendant's not having tested plaintiff for diabetes would have been of no moment if she was not diabetic. The only mention in the record of plaintiff's having been, or not having been diabetic, was testimony by defendant that the hospital conducted a blood-sugar test on plaintiff and that the result was "normal." The hypothetical question was silent as to whether or not plaintiff was diabetic. Again, an assumed fact critical to Dr. Quilligan's opinion on proximate cause having been omitted, the opinion was without probative value since, by Dr. Quilligan's own testimony, the defendant's negligence in not having conducted diabetic testing could not have caused the death of the fetus unless plaintiff was diabetic.

In order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing that a physician of ordinary skill, care, and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing that such a physician would have done under like or similar conditions or circumstances, and that the injury complained of was the direct and proximate result of such doing or failing to do such particular thing. *Bruni* v. *Tatsumi* (1976), 46 Ohio St. 2d 127 [75 O.O.2d 184], paragraph one of the syllabus. The standard of care for a physician in the practice of a board-certified medical specialty should be that of a reasonable specialist practicing medicine in that same specialty in light of the scientific knowledge in that specialty field. *Bruni* v. *Tatsumi, supra,* paragraph two of the syllabus.

Dr. Quilligan's own testimony was that neither the urinary estriol test nor the oxytocin challenge test was sufficiently accepted and utilized in 1975 to be considered a standard of practice. Accordingly, the trial court would have been warranted in finding that there was no evidence in the record to support plaintiff's contention that defendant was negligent in not having administered those tests.

Because there was no evidence of substantial probative value to support plaintiff's allegations of injury resulting from medical malpractice, it was not error for the trial court to conclude that reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion was adverse to plaintiff. The assignment of error is overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

WHITESIDE, P.J., and McCORMAC, J., concur.