*Judgment reversed
and case remanded
with instructions.*

REILLY, P.J., and WILSON, J., concur.

ROGER B. WILSON, J., of the Champaign County Common Pleas Court, sitting by assignment.

---

**SEDGWICK, Appellee,**

v.

**KAWASAKI CYCLEWORKS, INC., Appellant;**

**American Honda Motor Company, Inc., Appellee.**

[Cite as *Sedgwick v. Kawasaki Cycleworks, Inc.* (1991), 71 Ohio App.3d 117.]

Court of Appeals of Ohio,
Franklin County.

No. 89AP–302.

Decided Jan. 15, 1991.

**118**

*Matan & Smith* and *James D. Colner,* for appellee.

*Sheppard & Bale, David G. Bale* and *Alan Wayne Sheppard,* for appellant.

STRAUSBAUGH, Judge.

This is a products liability action involving injuries sustained by plaintiff, Kim L. Sedgwick, in the operation of a Honda motorcycle. Plaintiff brought suit against defendant, Kawasaki Cycleworks, Inc., the dealer which modified and sold the motorcycle to plaintiff. At trial, plaintiff proceeded against defendant on the theories of defect in the modification of the motorcycle and failure to warn plaintiff of the risk of harm. Plaintiff's original complaint also named American Honda Motor Co., Inc. ("Honda") as a defendant to the action. Plaintiff subsequently filed a notice of voluntary dismissal of his claims against Honda.

On May 16, 1981, plaintiff purchased a Honda CB750F motorcycle from defendant. In February 1981, prior to plaintiff's purchase, defendant had obtained the motorcycle from Honda as a standard Honda 750 motorcycle which was delivered in a crate and assembled by defendant. Subsequently, in April 1981, defendant modified the motorcycle in order to give the product greater sales appeal. The modifications undertaken by defendant included the installation of a frame-mounted wind fairing, lower handlebars, rear-set foot pegs, rearward placed brake and shift levers, shorter wiring to the switches, and shorter cables. While some of the modifications were made with Honda parts, the wind fairing installed on the motorcycle was manufactured by the Don Vesco Company.

On May 17, 1981, one day after purchasing the motorcycle, plaintiff was riding the motorcycle in the downtown Columbus area. Plaintiff was accompanied by a friend, Asa Moore, who was on a separate motorcycle. Both riders were traveling north on Fourth Street when they came to a stop at a traffic light. When the light turned green, Moore accelerated ahead of plaintiff in order to observe how plaintiff was handling the motorcycle.

Moore testified that he accelerated to approximately thirty to thirty-five m.p.h. As Moore proceeded ahead of plaintiff he observed two cars on either side of plaintiff. Moore was approximately fifty to sixty feet ahead of plaintiff when he last saw plaintiff. At some point plaintiff lost control of the motorcycle, colliding with the curb and guardrail along a section of viaduct on Fourth Street. As Moore proceeded along a curve in the viaduct he heard a crash which he thought was caused by a boxcar from a nearby railway. When Moore came to a subsequent stoplight, a driver in a car informed him that " * * * your friend went down back there." Moore returned to the area of the accident and found plaintiff lying unconscious near the curb of the street. Plaintiff's motorcycle was approximately ten to fifteen feet from plaintiff. Plaintiff suffered multiple injuries as a result of the accident, including blunt abdominal trauma, multiple rib fractures, a left hip fracture, right ankle fracture, lower back fracture, a knee fracture, and a pelvic fracture.

Plaintiff alleges that the injuries he suffered were caused by interference between the handlebars and fairing and the inadequate placement of mirrors on the motorcycle. Following the accident, plaintiff was unable to recall specific events leading up to the accident. Prior to trial, plaintiff underwent two sodium amytal sessions in an effort to help facilitate recall of his memory. Sodium amytal is a chemical substance, used in psychiatric practice, to aid in the retrieval of lost memory. The purpose of the drug is to induce a state of relaxation in the patient, similar to hypnosis, in order to allow the patient to speak freely by removing inhibitions or barriers which may have been the result of past trauma or stress. The sessions were conducted by Dr. Even Halas, a psychiatrist. During the first session, plaintiff fell asleep shortly after being administered the drug. However, during the second session plaintiff was able to recall a number of events which he previously had not been able to remember. More specifically, plaintiff recalled that when he accelerated from the stoplight on Fourth Street, he looked over his left shoulder to observe a car he had heard approaching on his left side. Plaintiff related that the car eventually overtook him and cut in front of him, forcing him to swerve the motorcycle to avoid hitting the car. Plaintiff recalled that in attempting to avoid the car, his hands became trapped between the handlebars and fairing, causing him to lose control of the motorcycle and head toward the curb.

Prior to trial, defendant filed two motions *in limine* to exclude any testimony by plaintiff or Dr. Halas concerning plaintiff's rehabilitated memo-

ry following the sodium amytal sessions. The trial court conducted a preliminary hearing to determine the admissibility of this evidence. The trial court reviewed the evidence under the guidelines set forth in *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, regarding the admissibility of testimony by a witness whose memory has been refreshed by hypnosis prior to trial. The trial court determined that the proposed testimony was sufficiently reliable to be admitted.

At trial plaintiff testified as to his memory of the accident both before and after the sodium amytal sessions. During plaintiff's case-in-chief, Dr. Halas testified concerning the use of sodium amytal in psychiatry and the procedures involved during the administration of the drug to a patient. Dr. Halas further testified concerning the sessions conducted with plaintiff.

Asa Moore testified that he had accompanied plaintiff to the dealership at the time of the purchase. Both plaintiff and Moore noticed a problem with interference between the handlebars and fairing at this time. Moore related that Rick Saltzman, the manager of the store, indicated that the problem could be rectified by modifying the fairing. Following plaintiff's purchase of the motorcycle, Moore rode the motorcycle and found that his hands would come into contact with the fairing while making turns.

Plaintiff's expert witness, Neil Schultz, testified as to the design of the motorcycle, including the fairing and mirrors, which he found to be defective. Schultz gave his opinion that these defects caused plaintiff's injuries.

John Snider testified as an expert on behalf of defendant. Snider testified that, in his opinion, the accident could not have occurred in the manner related during plaintiff's case-in-chief.

At the close of plaintiff's evidence, defendant moved the trial court for a directed verdict. The trial court denied defendant's motion.

The jury returned a verdict in favor of plaintiff, finding that the motorcycle was defective and that such defects proximately caused plaintiff's injuries. Plaintiff was awarded $783,000 in damages. The trial court denied defendant's post-trial motions.

Defendant now appeals, setting forth the following eight assignments of error for review by this court:

"1. The trial court erred in admitting testimony produced after a witness was administered sodium amytal in an attempt to revive alleged memories repressed by the witness where, under the circumstances of the case and the sodium amytal session, the proponent of the testimony failed to present evidence the testimony was reliable.

"2. The trial court erred in limiting the defendant's cross-examination of the plaintiff's testimony.

"3. The jury erred in basing its verdict upon Mr. Sedgwick's sodium amytal session statements about how his accident occurred.

"4. The trial court erred in overruling a motion for new trial by the defendant or for the defendant's motion for judgment NOV, where the plaintiff failed to put on evidence relating the accident to a claimed defect in the defendant's product.

"5. The trial court erred in not granting the defendant's motion for judgment NOV or directed verdict when the plaintiff's evidence is contrary to the laws of nature and when the plaintiff's evidence is contradictory to the plaintiff's theory of recovery.

"6. The trial court erred in admitting testimony of Mr. Schultz, the plaintiff's reconstruction expert, where Mr. Schultz had assumed facts during his testimony which were not in evidence or which were contrary to the evidence admitted during the trial.

"7. The trial court erred in not directing a verdict for the defendant or providing defendant a judgment NOV on the basis that plaintiff had assumed the risk of injury in this case.

"8. The trial court erred in not granting the defendant's motion for a new trial under Rule 59 of the Ohio Rules of Civil Procedure because of the jury's improper quotient verdict. Further, the court failed to properly take evidence as to the quotient verdict pursuant to the defendant's motion for a new trial in light of the evidence of misconduct of the jury."

▇ Under its first assignment of error, defendant asserts that the trial court erred in admitting the testimony of a witness whose memory had been revived by sodium amytal where the proponent of the testimony failed to present evidence that the testimony was reliable.

As noted previously, plaintiff, subsequent to the accident, underwent two sodium amytal treatments in an attempt to revive his recollection of the circumstances surrounding the accident. Prior to trial, defendant filed two motions *in limine* to exclude any testimony by plaintiff regarding his rehabilitated testimony.[1] Defendant further sought to exclude the testimony of Dr.

---

1. Defendant's first motion *in limine* was filed prior to the Ohio Supreme Court's decision in *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, in which the court set forth guidelines regarding the admissibility of the testimony of a witness whose memory had been

Halas, the psychiatrist who conducted the sodium amytal sessions. Both motions were overruled by the trial court.

The primary basis of defendant's first assignment of error is that the testimony of plaintiff, regarding his recollection of events subsequent to the sodium amytal procedure, was unreliable under the standards set forth by the Supreme Court of Ohio in *State v. Johnston, supra*. In *Johnston*, the court held in paragraph three of the syllabus:

"Testimony supplied by a witness whose memory has been refreshed by hypnosis prior to trial is admissible only if the trial court determines that, under the totality of the circumstances, the proposed testimony is sufficiently reliable to merit admission."

In *Johnston*, the court adopted a case-by-case approach by which a trial court conducts an individualized inquiry as to the admissibility of hypnotically refreshed testimony. The *Johnston* court determined that this inquiry should be addressed by the trial court in a pretrial hearing. The court listed the following guidelines which the trial court may consider in deciding whether, under the totality of the circumstances, the proposed testimony should be admitted:

"(a) The hypnosis session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis, to ensure the most accurate recall possible.

"(b) The qualified professional conducting the hypnosis session should be independent from any of the parties in the case, to avoid any biased procedures or questions.

"(c) Any information given to the hypnotist by any of the parties to the case prior to the hypnosis session should be recorded, at a minimum in writing, so that the trial court can determine the extent to which the subject may have received any information from the hypnotist.

"(d) Before the hypnosis session, the hypnotist should obtain a description of the facts from the subject, avoiding adding new elements to the subject's description, so that the trial court can compare the subject's pre- and post-hypnotic recollection.

"(e) The hypnosis session and all other contact between the hypnotist and the subject should be recorded, preferably on video tape, so that a permanent record is available to reveal the presence of any suggestive procedures or questions.

---

refreshed by hypnosis. Defendant's second motion *in limine* dealt with the application of the *Johnston* guidelines to the present case.

"(f) Generally, only the hypnotist and the subject should be present during the hypnosis session, in order to protect against inadvertent influence. However, other persons may be present if their attendance is necessary and steps are taken to prevent their influencing the results of the session." *Johnston, supra,* at 55, 529 N.E.2d at 906.

The court further held:

"In examining the totality of the circumstances, the trial court may consider any other factors affecting the reliability of the proposed testimony, such as the presence of conflicting or corroborating evidence independent of the proposed testimony, the appropriateness of using hypnosis to restore the subject's memory, and any discernible motivation the subject might have for remembering or forgetting the events in question. At trial, the trial court should give wide latitude to the party opposing the testimony in cross-examining the witness, and should provide the jury, if any, with a cautionary instruction explaining the potential dangers of hypnosis." *Id.*

As stated before, the trial court conducted a pretrial hearing to review the procedures employed during the sodium amytal sessions and to consider the reliability of plaintiff's testimony before ruling on the question of admissibility. We note that during the pretrial hearing there was discussion of whether the *Johnston* guidelines, regarding memory refreshed by hypnosis, were applicable for purposes of determining the reliability of memory retrieved by the process of sodium amytal. The trial court, while noting the differences between the two techniques, reasoned that the *Johnston* guidelines should be applicable to the present case inasmuch as both hypnosis and sodium amytal involve the attempt to facilitate induced retrievable recollection.[2]

During the pretrial hearing, the trial court viewed the videotaped deposition testimony of defendant's expert, Dr. C. Eric Johnston, concerning the effects of sodium amytal. The trial court also listened to the audiotape of the first sodium amytal session and heard arguments from counsel regarding the reliability of sodium amytal. The trial court noted during the pretrial hearing that it had read the transcript of the second sodium amytal session in its entirety prior to the hearing. The trial court, in applying the *Johnston* guidelines to the facts of the present case, determined that, under the totality of the circumstances, the proposed testimony was sufficiently reliable for purposes of admissibility.

---

**2.** Support for the trial court's reasoning is found in *United States v. Solomon* (C.A.9, 1985), 753 F.2d 1522, in which a witness was administered sodium amytal before testifying at trial. In *Solomon,* the Ninth Circuit Court of Appeals, in upholding the trial court's ruling to admit the testimony of the witness, noted that the trial court had applied the teachings of hypnosis cases from that circuit in ruling upon admissibility.

The record in the instant action indicates that Dr. Halas, the individual who conducted the sodium amytal sessions, was a licensed psychiatrist experienced in the use of sodium amytal. Dr. Halas was not affiliated with plaintiff's counsel, having no dealings with plaintiff's counsel prior to plaintiff's two sodium amytal sessions. Plaintiff's counsel contacted Dr. Halas by telephone to discuss in general the nature of plaintiff's inability to recall the events of the accident prior to the sodium amytal sessions. Dr. Halas was not informed of plaintiff's theory of recovery or of any particular information that he was supposed to retrieve from plaintiff before conducting the sessions. Dr. Halas, who kept a chart and handwritten notes concerning information he received surrounding the sessions, spoke with plaintiff prior to the sessions concerning his recollection of the accident and took notes of this conversation. Both sodium amytal sessions were recorded on audiotape. Plaintiff's counsel was present during the sessions but did not participate by asking any questions.

The record also indicates that during the pretrial hearing the trial court entertained evidence concerning the appropriateness, under the particular facts of the present case, of the use of sodium amytal to restore plaintiff's memory. Defendant had advanced the argument that plaintiff had suffered an organic brain injury which would render the results of the sodium amytal sessions unreliable. The trial court found no evidence from the medical records to indicate that plaintiff suffered from organic brain damage.

Based upon a review of the record, we find that the evidence supports the trial court's finding that, under the totality of the circumstances, the proposed testimony was sufficiently reliable to be admitted. Defendant expresses concern about the methodology employed by Dr. Halas in conducting the sessions and contends that he improperly used leading questions to elicit statements from plaintiff. We have reviewed the transcripts of both sodium amytal sessions and although some of the inquiries by Dr. Halas arguably contain leading elements, we cannot say that these questions were so blatantly leading as to suggest to plaintiff a desired result or to render the sessions unreliable. Defendant further points to the fact that plaintiff's counsel attended the sessions. Dr. Halas testified at trial that he requested plaintiff's counsel's presence during the sessions because of the potential difficulty of understanding all of the retrieved words while plaintiff was under the effects of the barbiturate. While we would agree with defendant's assertion that plaintiff's attorney should not have been in the interview room at the time of the sessions, there is no evidence from the record to suggest that the attorney's presence influenced plaintiff's testimony.

In sum, based upon the record before us, we find that the trial court did not abuse its discretion in admitting plaintiff's testimony. Accordingly, defendant's first assignment of error is overruled.

 Under its second assignment of error, defendant asserts that the trial court erred in limiting defendant's cross-examination of plaintiff's testimony. Defendant's claim of error involves a chart and report of plaintiff's treating psychiatrist, Dr. Henn.

During the trial court's preliminary hearing concerning the issue of the admissibility of plaintiff's sodium amytal refreshed memory, plaintiff introduced the chart of Dr. Henn as evidence of whether plaintiff suffered an organic brain injury. At the beginning of the trial, plaintiff requested an order *in limine* to exclude any reference to Dr. Henn's chart during the trial. The trial court sustained plaintiff's motion.

Defendant contends that the trial court should have permitted defendant to use Dr. Henn's chart on cross-examination of plaintiff in order to better explore plaintiff's motivation to recall the accident. Defendant argues that while the chart contained evidence prejudicial to plaintiff, such evidence was relevant and admissible under the language of *Johnston, supra.*

The chart at issue contained the impressions of Dr. Henn taken during psychiatric therapy sessions with plaintiff. The trial court found that the prejudicial effect of the evidence contained in Dr. Henn's notes, which included references to an attempted suicide, domestic difficulties, and a settlement with a former codefendant in this action, outweighed its probative value.

A trial court has broad discretion under Evid.R. 403. Where a trial court determines that certain evidence will be admitted or excluded from trial, the ruling of the trial court will not be reversed unless there has been a clear and prejudicial abuse of discretion. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 100, 407 N.E.2d 490, 493. Having reviewed the chart of Dr. Henn, we find that the trial court did not abuse its discretion in excluding this evidence. While *Johnston, supra,* provides for the trial court to give the party opposing testimony wide latitude in cross-examining the witness, the holding in *Johnston* does not circumvent the trial court's discretion to exclude highly prejudicial evidence under Evid.R. 403. Moreover, defendant had the opportunity to attempt to impeach plaintiff's testimony by other means apart from the use of the psychiatrist's personal observations.

Finding no abuse of discretion in the trial court's ruling, defendant's second assignment of error is overruled.

 Under its third assignment of error, defendant asserts that the jury erred in basing its verdict upon plaintiff's sodium amytal statements concerning how his accident occurred. Defendant's assignment of error pertains to an interrogatory returned by the jury.

Interrogatory number four requested the jury to indicate what evidence it relied upon in rendering its verdict. The jury's response stated:

"(1) Kim Sedgwick's taped interview with Dr. Hallis [*sic*]—Plaintiff's exhibit # 82

"(2) Plaintiff's exhibit # 18 [brochure of the Don Vesco fairing installed on the motorcycle]

"(3) Testimony of Asa Moore

"(4) Damaged bike pictures[.]"

Defendant contends that plaintiff's taped interview with Dr. Halas, noted by the jury under the first response, was improperly used by the jury in reaching its verdict. Defendant maintains that the jury misunderstood the trial court's instruction concerning the use of the tapes and reviewed the tapes for the truth of the matter asserted.

In the present case, the trial court specifically instructed the jury regarding the use of the sodium amytal sessions. The court, in emphasizing to the jury that the ultimate recollection of plaintiff as to important and relevant facts was stimulated by a process of memory retrieval involving the use of sodium amytal, instructed the jury that " * * * [i]n receiving and weighing the testimony of plaintiff under these circumstances, you may consider the process that gave rise to the activation of plaintiff's memory."

In addressing defendant's argument that the jury instruction regarding the sodium amytal testimony was apparently inadequate, we note that defendant failed to object to the trial court's instruction at trial. Moreover, it is unclear from the jury's response to the interrogatory as to what manner they utilized the evidence from the tapes, *i.e.*, whether the jury actually considered the tapes for the truth of the facts recounted, or whether the jury considered the tapes as an aid in understanding the process of sodium amytal which " * * * gave rise to the activation of plaintiff's memory." Accordingly, we are unpersuaded by defendant's contention that the instruction was inadequate or that the jury lost its way in reaching a verdict.

We further note that introduction of the sodium amytal taped sessions occurred during defendant's case-in-chief after the jury had already heard plaintiff's testimony concerning his refreshed recollection. Moreover, it was at defendant's own request that the audiotapes were played before the jury. During defendant's case-in-chief, defendant offered the videotaped deposition testimony of Dr. C. Eric Johnston. During Dr. Johnston's testimony, he was asked by defense counsel whether he felt that Dr. Halas had utilized leading questions in order to obtain a response from the subject. Dr. Johnston then quoted from various portions of the transcripts. Following the taped testimo-

ny of Dr. Johnston, plaintiff, in rebuttal, offered into evidence the transcript of the second sodium amytal session which the trial court then admitted into evidence. Defendant then requested that the jury be allowed to listen to the audio tapes of both sodium amytal sessions. The trial court granted defendant's request and played the tapes before the jury.

In light of the foregoing, and the fact that the jury answered other interrogatories consistent with the general verdict, we reject defendant's claim of reversible error. Defendant's third assignment of error is overruled.

■ Under its fourth assignment of error, defendant asserts that the trial court erred in overruling defendant's motion for a judgment notwithstanding the verdict or, alternatively, defendant's motion for a new trial. Defendant contends that plaintiff failed to put on evidence relating the accident to a claimed defect in the defendant's product.

Both parties cite *State Farm Fire & Cas. Co. v. Chrysler Corp.* (1988), 37 Ohio St.3d 1, 523 N.E.2d 489, as setting forth the applicable Ohio law with regard to products liability. In *State Farm*, the court held:

" * * * [T]he plaintiff's burden of proof consists of alleging and proving, by a preponderance of the evidence, that: (1) there was, in fact, a defect in the product manufactured and sold by the defendant; (2) such defect existed at the time the product left the hands of the defendants; and (3) the defect was the direct and proximate cause of the plaintiff's injuries or loss. * * * " *Id.* at 5–6, 523 N.E.2d at 493.

In *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 347, 28 OBR 410, 411, 504 N.E.2d 19, 21, the Supreme Court of Ohio discussed the applicable test to be applied by a trial court in ruling on a motion for judgment notwithstanding the verdict. The court held:

" * * * The evidence adduced at trial and the facts established by admissions in the pleadings and in the record must be construed most strongly in favor of the party against whom the motion is made, and, where there is substantial evidence to support his side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied. *Neither the weight of the evidence nor the credibility of the witnesses is for the court's determination * * *.*" (Emphasis added.) *Osler, supra,* at 347, 28 OBR at 412, 504 N.E.2d at 21–22. See, also, *Cardinal v. Family Foot Care Centers, Inc.* (1987), 40 Ohio App.3d 181, 532 N.E.2d 162.

· Further, the Supreme Court of Ohio has held that "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest

weight of the evidence." *C.E. Morris Co. v. Foley Construction Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

Defendant basically contends that plaintiff failed to present sufficient evidence to show that the claimed defect caused the accident. Defendant further argues that plaintiff's expert, Neil Schultz, was improperly allowed to base his testimony upon factually unsupported premises.

At trial, plaintiff testified that prior to the accident he remembered experiencing both of his hands getting caught between the handlebars and the fairing. Plaintiff further related that:

" * * * [I]f there was a car behind me, either on my left-hand side or my right-hand side, I had to look over my shoulders because the placement of the mirrors that were on the fairing didn't allow any view of what was behind me."

Plaintiff gave the following testimony concerning his recollection of the accident:

"I remember that I was riding up Fourth Street and hearing a car behind me on my left-hand side. I remember having to look over my left shoulder to see this car and later on having it beside me.

"I further remember the car swerving in front of me or cutting in front of me, and myself having to swerve out of the way to avoid hitting him. In doing so, I remember my left hand getting caught and of trying to get my left hand free between the handlebar and the fairing.

"The next thing I remember is getting my right hand caught between the handlebar and the fairing. I remember trying to get my right hand uncaught, and suddenly the bike seemed to have been going faster or the engine was revving or the noise was getting louder from the engine.

"I remember losing control of the motorcycle and seeing the curb, and from there it goes blank."

Schultz testified as an expert for the plaintiff. Schultz stated that he had a Master's degree in applied science and that he had received special training in the repair of motorcycles.

Schultz testified that he had visited the scene of plaintiff's accident and evaluated the roadway. Schultz reviewed the police report of the accident, took photographs, and reviewed deposition testimony from different parties. He also researched articles relative to the case and spoke with different individuals to provide further input.

Schultz conducted an examination of the motorcycle at its storage site. He conducted a thorough inspection of the motorcycle, including the steering system, suspension, hydraulic fluid, tires, front and rear wheel alignment,

brakes, engine, transmission, and mirrors. He checked for any obstructions or possible interference with the handlebars or fairing. Schultz testified that his inspection of the motorcycle revealed interference between the handlebars and the fairing. He stated that in placing his hand on the handlebar, "I moved it back and forth, and I found that my hand hit the fairing before the steering stem came to a stop. Every time I would turn, I would hit my hand." Schultz further testified that he did not believe that the mirrors were adequate for the motorcycle.

Plaintiff's counsel asked Schultz to respond to a series of hypothetical questions based upon his inspection of the motorcycle in its damaged state, his inspection of the scene of the accident, his review of deposition testimony, including that of plaintiff and Asa Moore, and his review of the photographs he took, various relevant motorcycle manuals and the police report. The hypothetical questions posed asked Schultz to assume that:

" * * * [H]e [plaintiff] was operating this motorcycle on May 17, 1981, in its state as modified by the dealer * * * that he was northbound on North Fourth Street with his friend, Asa Moore, to his left, stopped at the light at North Fourth and Naughten.

"On that day, the light turned green, and Asa Moore accelerated in front of Mr. Sedgwick. Mr. Sedgwick proceeded behind him at a speed no greater than 35 miles an hour, that as he was approaching the first curve in that roadway * * * there were cars on both sides of him, and in particular, a car on his left coming up from behind that got to the point of nearly passing him.

"And that Mr. Sedgwick was not able to clearly see this car because the mirrors installed inside the fairing were blocked by the handlebars, and that he had to turn his head to the left to see this car coming up upon him and that the car either actually passed him and cut him off or was in the process of doing that or got close enough to Mr. Sedgwick to think that he was—the car was going to do that, and that Mr. Sedgwick was placed in a critical position where he felt like he had to move the bike to get away from this car.

"That he turned the handlebars to his right to avoid this car, and his left hand got caught in the process between the handlebar and the fairing, that to extricate him from that situation, he then turned the handlebars to the left, at which time he got his right hand caught in the handlebars and the fairing, and that in the process of trying to pull his right hand back away from the fairing, the throttle was accelerated and opened.

"The vehicle accelerated. At this point in time, Mr. Sedgwick lost all control of the bike, and the bike went off to the right, jumped the curb and bounced off the retaining wall on North Fourth Street before it came to its ultimate crash."

Based upon the above factual assumption, Schultz stated that:

"My opinion is that the bike was defective, and the defects were that there were not proper mirrors on there, and that there was interference between the handlebars and the fairing."

Schultz was then asked whether he had an opinion whether or not this accident would have resulted if the motorcycle did not have the defects identified. Schultz stated that:

"My opinion is that this accident most probably would not have happened because he would not have had to turn his head behind to look, and also he would have been able to gain control because his hands wouldn't have caught on the fairing when he tried to adjust for the steering and compensate for it."

Applying the appropriate standards in Ohio and considering this and all the evidence presented in the light most favorable to the plaintiff, it is clear that reasonable minds might reach different conclusions from the evidence. Based upon an independent review of the record, we find that there was sufficient evidence presented by plaintiff to convince a reasonable jury that the motorcycle sold to plaintiff was defective due to inadequate placement of the mirrors and interference between the handlebars and fairing, and that such defects were a substantial factor in causing plaintiff's injuries.

Defendant, which presented evidence to the contrary, including testimony of its own expert, John Snider, maintains that there were other reasonable possibilities of how the accident could have occurred. While there was, of course, conflicting evidence presented to the jury, the jury obviously chose to accept plaintiff's account of how the accident happened. To the extent that defendant's contentions constitute an attack upon the weight and credibility of the evidence, such matters are to be determined by the jury rather than on appellate review.

Based upon the foregoing, the trial court did not err in denying defendant's motion for judgment notwithstanding the verdict or motion for new trial. Accordingly, defendant's fourth assignment of error is without merit and is hereby overruled.

■ Under its fifth assignment of error, defendant argues that the trial court erred in not granting defendant's motion for judgment notwithstanding the verdict or motion for directed verdict on the basis of defendant's assertion that plaintiff's evidence is contrary to the laws of nature and contradictory to plaintiff's theory of recovery. Defendant, relying in large part upon the testimony of its expert witness, John Snider, contends that the accident could not have occurred in the manner presented by plaintiff based upon the laws of

nature, the dynamics of motorcycle operation, and the testimony plaintiff provided as to the dynamics of the accident.

This court has reviewed the conflicting theories presented by both sides and we find that there certainly was evidence before the jury upon which, if weighed most favorably to the plaintiff, reasonable persons could have reached different conclusions. Defendant's objections basically concern the weight of the evidence and the credibility of the testimony presented by plaintiff and his experts. It is the function of the jury to assess " * * * [t]he credibility of witnesses, the weight to be given their testimony, and the resolution of conflicts in the evidence * * *," and we decline to substitute our judgment for that of the jury. *Hardiman v. Zep Mfg. Co.* (1984), 14 Ohio App.3d 222, 226, 14 OBR 250, 254, 470 N.E.2d 941, 946.

Accordingly, defendant's fifth assignment of error is overruled.

■ Under its sixth assignment of error, defendant asserts that the trial court erred in admitting the testimony of Neil Schultz, plaintiff's reconstruction expert, where Schultz had assumed facts during his testimony which were not in evidence or which were contrary to the evidence admitted during the trial. More specifically, defendant's claim of error concerns a hypothetical question propounded to Schultz. Defendant argues that plaintiff never testified as to how fast he was going at the time of the accident nor did plaintiff provide any real cause-and-effect testimony. Thus defendant maintains that the trial court improperly allowed Schultz to testify on a hypothetical question which did not recite facts actually in evidence.

In accordance with Evid.R. 703, the facts or data upon which an expert bases an opinion must be those perceived by him or admitted in evidence at trial. See *State v. Jones* (1984), 9 Ohio St.3d 123, 9 OBR 347, 459 N.E.2d 526; *State v. Chapin* (1981), 67 Ohio St.2d 437, 21 O.O.3d 273, 424 N.E.2d 317. In *Utility Coals, Inc. v. Fruehauf Corp.* (July 20, 1971), Franklin App. No. 71–28, unreported, this court stated:

" * * * A hypothetical question is improper only where it assumes facts not in evidence, unfairly reflects the facts in evidence, or omits facts in evidence so vital to the conclusion of the expert that the question manifestly fails to present the facts which it does include in their true and just relationship. Whether a hypothetical question is proper lies largely within the discretion of the trial court."

In *Mayhorn v. Pavey* (1982), 8 Ohio App.3d 189, 191–192, 8 OBR 258, 261, 456 N.E.2d 1222, 1226, this court noted that in instances where there is a conflict in the evidence relating to the existence of a fact which is material to the expert witnesses' forming an opinion, " * * * counsel propounding the

hypothetical question is entitled to include as an assumed fact his version of the evidence on the disputed fact. It is then for the trier of the facts to resolve the factual dispute and, depending upon its findings, to determine what weight it will give to the opinion-answer. * * * "

Concerning defendant's argument that there was no evidence as to how fast plaintiff was going at the time of the accident, Moore testified that at the light he accelerated between thirty to thirty-five m.p.h. to get far enough ahead of plaintiff to be able to observe plaintiff. While positive proof as to plaintiff's speed is not available, as in many cases such as the present, reasonable inferences must be drawn from the evidence presented. Based upon Moore's testimony that he had accelerated to thirty to thirty-five m.p.h. to stay ahead of plaintiff, it is not an unreasonable inference to assume that plaintiff was proceeding behind him " * * * at a speed no greater than 35 miles per hour * * *." We further note that Moore also testified that he had never observed plaintiff exceed the speed limit while operating his motorcycle. We find that the question did not assume a fact not in evidence concerning plaintiff's speed.

Defendant further asserts that plaintiff failed to provide adequate cause-and-effect testimony. We have previously addressed the issue of causation and we conclude that the trial court did not abuse its discretion in finding sufficient factual foundation to allow the hypothetical questions. Defendant's argument that the evidence was insufficient to enable Schultz to form an opinion goes to the weight accorded the testimony, not its admissibility.

Defendant's sixth assignment of error is without merit and is overruled.

■ Under its seventh assignment of error, defendant argues that the trial court should have granted defendant a directed verdict or judgment notwithstanding the verdict on the basis that plaintiff assumed the risk of injury. Under Ohio law, assumption of risk is an affirmative defense in an action brought for strict liability in tort for a design defect. *Bowling v. Heil Co.* (1987), 31 Ohio St.3d 277, 282, 31 OBR 559, 563, 511 N.E.2d 373, 377. In *Onderko v. Richmond Mfg. Co.* (1987), 31 Ohio St.3d 296, 299, 31 OBR 576, 578, 511 N.E.2d 388, 390, the Supreme Court of Ohio held that "[v]oluntary and unreasonable assumption of a known risk posed by a product constitutes an absolute bar to recovery in a products liability action based upon strict liability in tort. * * * " In general, the issue of assumption of risk is a factual question to be left to the jury except when reasonable minds can reach but one conclusion. *Kafel v. Republic Steel Corp.* (1972), 30 Ohio St.2d 55, 60, 59 O.O.2d 79, 82, 282 N.E.2d 350, 353.

In the present case, plaintiff testified that he had experienced interference between the handlebars and the fairing prior to the accident. Plaintiff stated that despite this knowledge, he continued to ride the motorcycle because he

did not think that the problem was too severe. Plaintiff also testified that prior to the accident he had never experienced any critical situations while riding the motorcycle where he was required to take evasive action to avoid hitting another vehicle.

While plaintiff testified that he was aware of interference between the handlebars and fairing, the question at issue is whether he appreciated the specific danger of being unable to control the motorcycle in a crucial driving situation. As already noted, plaintiff testified that he did not feel at the time that the interference problem was too severe. Further, plaintiff had only operated the motorcycle one day prior to the accident. Whether or not plaintiff appreciated the magnitude of the risk in continuing to ride the motorcycle was a question of fact to be determined by the jury. Viewing the evidence in the light most favorable to the plaintiff, the jury could have reasonably found that plaintiff did not possess the requisite awareness to have assumed the risk of the defect in continuing to ride the motorcycle. Accordingly, we hold that the trial court did not err in denying defendant's motions for directed verdict or judgment notwithstanding the verdict.

Defendant's seventh assignment of error is overruled.

■ Under its eighth assignment of error, defendant asserts that the trial court erred in not granting defendant's motion for a new trial based upon defendant's claim of misconduct by the jury. Defendant filed a motion for a new trial, alleging in part that the jury reached its decision by a quotient verdict. In support of its motion, defendant submitted the affidavits of Donna Strait, a juror, and Bob Bauer, an employee of Industrial Fabricators, a place of business which also employed one of the jurors, Robert Sauls. The affidavit of Strait stated that each juror, in deliberating upon damages, placed his or her vote on a paper and then the average of the figures was calculated to arrive at a quotient. Strait further stated that on the final quotient, the jury agreed to be bound by the quotient. The affidavit of Bauer stated that juror Sauls, after completing his duty as a juror, " * * * related that the jury had arrived at a verdict by having each member of the jury write his or her figure down on a piece of paper and dividing the total by the number of jurors * * * [.]"

Plaintiff filed a memorandum contra defendant's motion for a new trial. Attached to plaintiff's memorandum were the affidavits of three jurors, Ruth Ann Norris, Debbie Wright, and Lanne Jolley. All three jurors stated in their affidavits that "[a]t no time did the jury enter into ny prior agreement to be bound by an average of the individual damage figures of each juror."

The vitiating element in a quotient verdict is not the acceptance of the quotient figure, but rather is the prior agreement to be bound by that figure,

regardless of what it may be. *Lund v. Kline* (1938), 133 Ohio St. 317, 320, 10 O.O. 411, 412, 13 N.E.2d 575, 576. Under Ohio law, " * * * affidavits of jurors will not be received to impeach their own verdict unless foundation for their introduction is first laid by competent evidence *aliunde, i.e.,* by evidence from some other source." *Id.* at 319, 10 O.O. at 412, 13 N.E.2d at 576. Evid.R. 606(B) states, in pertinent part:

"Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict * * * or concerning his mental processes in connection therewith. A juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any juror, only after some outside evidence of that act or event has been presented. * * * "

The Staff Note to Evid.R. 606(B) provides, in relevant part:

" * * * The *aliunde* rule requires the introduction of evidence from a competent source other than a juror to impeach a jury verdict. A juror can then testify, but the outside source must first be established. * * * "

In the present case, the affidavit of juror Strait, submitted to impeach the verdict, is clearly inadmissible unless it falls within an exception to the general rule. Defendant has submitted the affidavit of Bob Bauer in an apparent attempt to provide evidence from an outside source. However, the evidence presented by the affidavit of Bauer derives its source or proof from a juror's own testimony and is therefore prohibited. Inasmuch as a juror could not impeach his or her verdict directly by affidavit, defendant cannot indirectly attempt to impeach the verdict by affidavit as to what one juror said to a third party. Moreover, the affidavit of Bauer regarding what a juror had told him constitutes inadmissible hearsay. Accordingly, the trial court did not err in refusing to set aside the verdict and grant a new trial because of misconduct of jurors.

Defendant's eighth assignment of error is without merit and is overruled.

Based upon the foregoing, defendant's eight assignments of error are overruled, and the judgment of the trial court is affirmed.

*Judgment affirmed.*

BOWMAN and PEGGY BRYANT, JJ., concur.