**Zora H. GILLHAM, Plaintiff-Appellant,**

v.

**The ADMIRAL CORPORATION, Defendant-Appellee.**

No. 74–1398.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 9, 1974.

Decided Sept. 25, 1975.

Certiorari Denied Feb. 23, 1976. See 96 S.Ct. 1113.

---

1. The district court also found on this issue that proof of damage was inadequate.

John A. Lloyd, Jr., Thomas A. Huser, Daniel P. Dooley, Frost & Jacobs, Cincinnati, Ohio, for plaintiff-appellant.

Ralph F. Mitchell, Rendigs, Fry, Kiely & Dennis, Cincinnati, Ohio, for defendant-appellee.

Before PHILLIPS, Chief Judge, McCREE, Circuit Judge, and CECIL, Senior Circuit Judge.

McCREE, Circuit Judge.

This is an appeal from an order granting a motion for judgment *n. o. v.* setting aside an award of punitive damages and attorneys' fees in a products liability action brought to recover damages for injuries caused by a fire in a television set designed and manufactured by The Admiral Corporation (Admiral). Two issues are presented for review: (1) whether the district court erred in concluding that no reasonable person could have found that Admiral's conduct in designing and marketing the television was intentional, reckless, wanton, willful or gross so as to justify the award of punitive damages and attorneys' fees; and (2) whether the district court erred in excluding evidence of Admiral's conduct after appellant's injury, offered to show Admiral's state of mind or intent as a predicate for punitive damages.

We hold that the district court erred in granting the motion for judgment *n. o. v.* because there was sufficient evidence in the record for a reasonable person to conclude that Admiral's conduct permitted an award of punitive damages and attorneys' fees. Accordingly, we need not decide whether evidence of Admiral's conduct after appellant's injury should have been admitted.

Appellant, Zora Gillham, brought this action in the United States District Court for the Southern District of Ohio against appellee, The Admiral Corporation, seeking compensatory and punitive damages for severe burns and other serious and crippling injuries caused by a fire originating in her Admiral color television set. Jurisdiction is under 28 U.S.C. § 1332 based on diversity of citi-

zenship and damages exceeding $10,000 exclusive of interest and costs. The parties agree that the law of Ohio applies.

The issues of liability and damages were tried separately pursuant to Rule 42(b) of the Federal Rules of Civil Procedure. At the conclusion of the liability phase of the trial, the jury found Admiral liable for Mrs. Gillham's injuries. Thereafter, the claims for compensatory and punitive damages were tried to the same jury. The court permitted the question of punitive damages to go to the jury despite Admiral's motion for a directed verdict on this issue. That motion was taken under advisement in accordance with Rule 50(b) of the Federal Rules of Civil Procedure. The jury awarded compensatory damages of $125,-000.00, punitive damages of $100,000.00, and attorneys' fees of $50,000.00.

On January 29, 1974, within a month of the conclusion of the trial, the court granted Admiral's motion for judgment *n. o. v.*, setting aside the award of punitive damages and attorneys' fees. In its order, the court stated that the evidence could

> reasonably be interpreted to indicate that the defendant was negligent and even grossly negligent in its design of the television set, in its subsequent activities, and in its failure to warn customers of the potential fire hazard.

It also concluded that Admiral was guilty of a breach of implied warranty.[1]

However, it held that Admiral's conduct was not sufficiently reckless, wanton or outrageous to warrant an award of punitive damages.

The facts are not disputed. Mrs. Gillham purchased an Admiral television set with a 24A2 chassis in June 1964. On the evening of November 19, 1968, she watched a television program in her apartment for about an hour, turned the set off, and observed a blue flash come across the television screen, and left the room. She returned to the room about fifteen minutes later to find the television set on fire with flames rising almost to the ceiling. She attempted to beat out the fire with sofa pillows but when she heard an explosion, she called the fire department. She was severely burned by the flames, which had spread to her doorway by the time she fled the apartment. Burns covered 18.5 percent of her body surface, and 11 percent of her skin was destroyed by third degree burns.

Her burns and the complications resulting from them required her to be hospitalized for 18 months and to have seven operations. The complications attributable to her burns included infection and inflammation of the burns, systemic toxicity, fever, secondary pneumonia, loss of appetite and malnutrition, an acute chronic urinary tract infection, acute pancreatitis, thrombophlebitis, colitis, and a gastrocolonic fistula, which

---

1. As the opinion later discusses, the Ohio Supreme Court has stated in some of its opinions that unlawful conduct is an element of a cause of action wherein an award of punitive damages is sought. The district court apparently found only that Admiral's conduct lacked the element of willfulness necessary for an award of punitive damages, and did not consider the element of unlawfulness. We observe that the requisite unlawfulness may be found where a defect in a product breaches a warranty imposed by law. *E. g., Craig v. Spitzer Motors,* 109 Ohio App. 376, 160 N.E.2d 537 (1959). In that case, an Ohio court of appeals, in reversing a judgment for the defendant, in an action based upon the seller's misrepresentation of the condition of a used automobile to the purchaser, observed that in Ohio the "obligation of an express warranty is one imposed by law

and the action for its breach was originally considered to be in tort." 109 Ohio App. 380, 160 N.E.2d 539. In its opinion, the court also quoted with approval the following statement from 16 Ohio Jurisprudence (2d), Section 146:

> In practically all kinds of contract violations, the courts in Ohio have sought to compensate the injured party, not to reward him. This rule does not obtain, however, in those exceptional cases where the breach amounts to an independent, willful tort, in which event exemplary damages may be recovered under proper allegations of malice, wantonness, or oppression . . . It is true, also that if the breach involves an infraction of a duty imposed by law, it may be thus punished. 109 Ohio App. 380, 160 N.E.2d 539.

permitted fecal matter to enter her stomach. Her injuries transformed Zora Gillham from an active and vivacious woman into a virtual invalid who requires twenty-four hour nursing care.

In addition to her out-of-pocket expenses of $128,000 for medical care up to the time of trial, the testimony of Dr. William Altemier indicated that as a result of these injuries each year for the rest of her life Mrs. Gillham could be expected to incur medical expenses of $1,000 plus the expenses for full-time nursing care, estimated at $262 per week or $13,624 per year.[2]

The evidence established that the fire in Mrs. Gillham's television set was caused by ignition of the set's high voltage transformer, a component also commonly called a horizontal output transformer (H.O.T.) or "flyback" transformer; that this transformer was defectively designed; that the design created a fire hazard; and that Admiral's officials and designers knew that the high voltage transformer in her set and in other Admiral color television sets of the same model was fire hazardous.

Admiral began assembling color television sets of its own design in 1963. Its first color television chassis, consisting of all the electronic mechanisms except a picture tube, speakers or cabinet, was designated the "24" series. Mrs. Gillham's Admiral television contained a 24A2 chassis. Dr. Yon, appellant's expert witness, testified that the principal defect making the transformer in this model fire hazardous was the inclusion of unsuitable paper and wax materials. The paper was interleaved between the transformer windings. One wax compound was used to cover the core of the windings and another to cover the secondary windings.

Admiral made only one heat test on each of five transformers before releasing the design for production. These

tests showed that the operating temperatures of the transformers ran from 118.2 degrees Centigrade to 126.2 degrees Centigrade. The American Institute of Electrical Engineering Standard Classification of Insulating Materials specifies that the type of paper insulation employed in this transformer may not be used at temperatures in excess of 105 degrees Centigrade. The temperatures recorded in the heat tests also exceeded the "cold flow" point of the wax compound used on the core, which was 115 degrees Centigrade, and came within three degrees of its softening point, which was 129 degrees Centigrade. In addition, the temperatures came within three degrees of 129° Centigrade, the cold flow point of the wax comprising the outside covering.

Dr. Yon further testified that exposing paper insulation to excessive temperatures and using wax at temperatures exceeding one cold flow distortion point and closely approaching other cold flow and softening points causes these materials to degrade seriously and to wear out much more quickly than expected in normal use. When the materials degrade, the paper cracks and splits, the wax flows out of the transformer core, and the insulation is destroyed at critical points in the transformer. This condition results in electrical failures causing fires from electrical shorts and electrical arcs, which, in turn, ignite the flammable paper and wax. This fire hazard, Dr. Yon testified, should have been apparent to any reasonably prudent and qualified design engineer.

The high voltage transformer in plaintiff's television set was designed by Carl Olson, Project Manager of Admiral's Deflection Laboratory with the assistance of subordinates. Mr. Olson admitted at trial that at the time that he designed the transformer he had anticipated that it might catch fire in customers' homes.

**2.** Appellant's brief suggests that the jury's award of a total of $275,000, while in form including punitive damages and attorneys' fees, was actually intended only as compensatory damages for pain, suffering, and anticipated medical expenses in addition to out-of-pocket expenses of $128,000. This speculation, while interesting, is legally irrelevant.

Therefore, he designed what Admiral calls a high voltage cage, a device enclosing the high voltage transformer and some other components of the high voltage section. The cage was intended to contain the expected fires. There was testimony that Admiral made two tests in which the transformer was set on fire with a torch, and when the cage was closed, it contained the flames. There was other evidence, however, indicating that it was unreasonable to expect that the cage would contain a fire for any length of time because there were 38 holes in the lid of the cage, an opening at the bottom of the cage, and plastic rivets fastening the cover.

Shortly after the television sets containing this transformer were marketed, Olson and Admiral learned that the wax insulation was melting and dripping out of the high voltage cages and even dripping out of the sets. Olson admitted that this information indicated that the transformers were operating at temperatures higher than Admiral had anticipated. Admiral also learned that fires were originating in its 24A2 chassis caused by the high voltage transformer, and that the fires were not being contained in the cage but were igniting the television sets. In some instances, the resulting fires destroyed home furnishings and dwellings, and caused personal injuries.

As early as October 1964, four customers reported to Admiral that fires had occurred in their Admiral color television sets. All four fires were high voltage fires. Thereafter, Admiral received a steady stream of complaints about fires originating in its color television sets. By November 1968 when plaintiff's fire occurred, at least 91 such fires had been reported to Admiral.

Moreover, in November 1966, two years before the plaintiff's set caught fire, one of Admiral's transformer engineers conducted tests on 16 transformers returned by servicemen to Admiral. Every one of these transformers failed and burned. They all failed and burned in the same manner as the high voltage transformer in Mrs. Gillham's set because the paper and wax insulation failed.

All these transformers were identical in construction and insulation materials to the one in plaintiff's set. The engineer who conducted the tests commented, " . . . the wonder is that more failures did not occur." These tests confirmed customer complaints and demonstrated that many of the fires were caused by the high voltage transformers.

The evidence also disclosed that Admiral could feasibly have reduced this fire hazard substantially, or have eliminated it completely. Materials superior to the paper and wax were available for use as insulation in high voltage transformers long before Admiral designed its transformer in 1963, and these materials were used by other television manufacturers before 1963. Also, Admiral could have installed a fuse in the high voltage circuitry to cut off the electricity in the event of overheating.

The evidence thus demonstrated that when Admiral designed, manufactured and marketed appellant's television set it knew that the set presented a serious fire hazard. Nevertheless, Admiral did not warn prospective purchasers or owners of the danger despite the steady flow of reported fires originating in Admiral color television sets. Nor did Admiral redesign this model or stop marketing it during the period in question.

The evidence also disclosed that the highest officials of Admiral were aware of the fire hazard and its precise source and cause. I. F. Johnston, Admiral's Electronic Service Manager, admitted that he knew that these transformers were the "major source" of fires in Admiral color television sets. Summaries of the claims against Admiral arising from fires were circulated to and read by President Ross Siragusa, Jr., who kept some of them, and threw others away, but took no action of any kind. Moreover, there was evidence that Admiral officials sought to deceive customers about the fire hazard presented by the

color television sets. For example, on July 10, 1967, I. F. Johnston wrote a memorandum about a color television set with a chassis identical to the one in the set owned by Mrs. Gillham:

> We will receive a burned up CD2200 from our Boston Branch which is now approximately 2½ years past warranty.
>
> This set had burned up flyback transformer and it was repaired in our Boston Branch. The customer refused to take the set back but *under pressure and assurance that no more trouble would develop,* finally did so. This transformer was replaced in November 1966.
>
> The set has now not only burned up but also burned the interior of a room and caused considerable damage to the home. The set is being returned here for Lab examination, and we in turn will then forward it to the attention of John Landeck to determine the exact cause of the burning. No doubt lawsuits will follow. [Emphasis added.]

Shortly thereafter, on August 1, 1967, an Admiral field engineer reported a fire caused by an Admiral television set only 17 days after purchase:

> I finally got to inspect the remains of an LN5711 that Gen. Manager John Holmes reported had burned. (See enclosed "C" Report).
>
> This set had really gone, and I understand that a good portion of the customer's house went with it. As near as I can learn it happened about the 23rd or 24th of July after the family had retired for the night. They were awakened by the family cat, and rushed downstairs to find the TV in flames. By the time they arrived, it was too far gone to do anything but try to save the house, though.
>
> I have no idea how this started. The set was reduced to rubble, and I didn't have the heart to try to call the customer to try to find out more. The set was replaced to him by the Distributor, and I understand his insurance is taking care of the house, and minor burns that the customer suffered getting the TV out.

The record discloses that this was one of seven instances prior to Mrs. Gillham's injury where the fire occurred after the set had been turned off. Some sets burned in dealers' showrooms, even before they were sold. Nevertheless, nine years after Mrs. Gillham's set was marketed, Admiral had not warned its customers of this hazard of which it was fully aware.

Mrs. Gillham contends that the evidence demonstrates that Admiral in designing this television set, in making it available to the public, and in failing to warn prospective customers that the set presented a substantial fire hazard, acted willfully, deliberately, and with a callous disregard for the safety of customers. The willful and deliberate character of Admiral's actions was, she argues, sufficiently reckless and malicious to permit punitive damages under Ohio law.[3]

---

**3.** As we have already noted, appellant also asserts that the district court erred in excluding evidence including the existence of Admiral's "fire hazard" files relating to the hundreds of fires occurring after her fire in Admiral color sets identical or substantially similar to her set, and certain other evidence showing Admiral's callous disregard for its customers' safety.

She contends that the "fire hazard" evidence would have reinforced appellant's entitlement to punitive damages by showing that Admiral persisted in its reckless disregard of the safety of its customers after her fire, in the face of steadily mounting numbers of fires occurring in Admiral color television sets in customers'

homes, and that Admiral perfected and employed techniques and procedures for concealing the existence of the hazard, by making systematic misrepresentations that there was no such hazard and that no fires, or few fires, had ever occurred in its television sets in response to inquiries and complaints of customers.

Appellant also contends that the trial court erroneously excluded evidence of the additional cost of building a safe transformer and erroneously excluded an exhibit in which Admiral, in November, 1969, reported to the National Commission on Product Safety regarding the cost of safety features added to its television sets in the previous two years. Admiral re-

Admiral, although apparently conceding that its actions were reprehensible, argues that the district court was correct in refusing to permit the award of punitive damages to stand. It contends that in Ohio punitive damages may not be awarded in the absence of proof that the tortfeasor acted with actual malice, and that this record contains no evidence of malice on Admiral's part. Admiral does not suggest that punitive damages may not, as a matter of law, be awarded in products liability actions, but only that the facts of this case do not permit the implication that Admiral acted maliciously.

In *Columbus Finance, Inc. v. Howard,* 42 Ohio St.2d 178, 327 N.E.2d 654 (1975), the Ohio Supreme Court held that Ohio law required a finding of fraud, insult, or malice to sustain punitive damages, but that "actual malice may be inferred from conduct and surrounding circumstances." 42 Ohio St.2d 184, 327 N.E.2d 658. The court also specifically approved the following statement:

intentional, reckless, wanton, wilful and gross acts which cause injury to person or property may be sufficient to evidence that degree of malice required to support an award of punitive damages in tort actions. 42 Ohio St.2d 184, 327 N.E.2d 658.

The court found, however, that punitive damages were not proper in the case before it because there was no evidence from which malice could be inferred. The plaintiff finance company had repossessed defendants' furniture because of delinquent payments. Although defendants had a receipt marked paid in full, the plaintiff brought suit seeking judgment by confession on cognovit notes signed by defendants. The damages sought were for the deficiency remaining after the sale of the furniture. Because of an erroneous address on the petition, the defendants had no notice of the suit until after a judgment was entered and a bailiff levied execution on the defendants' automobile. While upholding the award for defendants' compensatory damages for wrongful attachment, the court found no evidence of malice to support punitive damages.

Similarly in *Bush v. Kelley's, Inc.,* 18 Ohio St.2d 89, 247 N.E.2d 745 (1969), the Ohio Supreme Court noted that the term malice "has been given many shades of meaning," and approved among others, the statement:

"It is an established principle of law in Ohio that in actions to recover damages for tort, which involves the ingredients of fraud, malice, or insult, or the wanton or reckless disregard of the legal rights of others, the jury may go beyond the rule of mere compensation of the party aggrieved, and reward exemplary or punitive damages. . . ." 16 Ohio Jurisprudence 2d 281, Section 145. [Emphasis added.] 18 Ohio St.2d 93, 247 N.E.2d 748.

In *Columbus Finance,* the Ohio court treated *Smithhilser v. Dutter,* 157 Ohio St. 454, 105 N.E.2d 868 (1957), cited by both parties, as an exception to the general rules regarding punitive damages, to be applied in cases involving alienation of affection of a spouse.

■ Moreover, under Ohio law it is clear that punitive damages may be awarded against a corporation, such as Admiral. *Western Union Telegraph Co. v. Smith,* 64 Ohio St. 106, 59 N.E. 890 (1901). In *Western Union,* a suit for wrongful cutting of plaintiff's trees, the court stated that a corporation could be subjected to punitive damages for the tortious acts of its agents within the scope of their employment in any case where a natural person acting for himself would be liable for punitive damages. *Ranells v. City of Cleveland,* 41 Ohio St.2d 1, 321 N.E.2d 885 (1975), is not to the contrary. It merely holds punitive damages cannot be assessed

---

ported that adding a "silicone H.O.T." to its "KIO" chassis increased the cost per unit by only sixty cents, and the same safety feature

for its H10, K20, and H12 chassis cost only $1.20 per unit.

against a municipal corporation without specific statutory authorization.

■ In determining whether the judgment *n. o. v.* was proper the court must view the evidence in the light most favorable to Mrs. Gillham, who secured the jury verdict, and a judgment *n. o. v.* may not be granted unless reasonable minds could not differ as to the conclusions to be drawn from the evidence. *Leach v. Millers Life Ins. Co.,* 400 F.2d 179 (5th Cir. 1968), *Teti v. Firestone Tire and Rubber Co.,* 392 F.2d 294 (6th Cir. 1968) (directed verdict). The court of appeals in reviewing the case is also bound by this standard. *Jones & Laughlin Steel Corp. v. Matherene,* 348 F.2d 394 (5th Cir. 1965).

■ Therefore the question before us is whether no reasonable person, viewing the evidence in the light most favorable to Mrs. Gillham, and drawing all reasonable inferences in her favor, could find that Admiral's conduct was so intentional, reckless,[4] wanton, willful, or gross that an inference of malice could be drawn. We conclude that the evidence, viewed in light of this standard, was sufficient to permit a reasonable person to conclude that Admiral knew that its design posed a grave danger to the lives and property of its customers, and therefore that its failure to redesign the set or warn the public was conduct sufficiently intentional, reckless, wanton, willful, or gross to permit a reasonable inference of malice.

The record supports the conclusion that Admiral *knew* that its transformers might catch fire because of improper and dangerous design, and that it knew or should have known, even before the set was marketed, that the purported safety device designed to contain the anticipated fires was ineffective. Moreover, the evidence demonstrates that shortly after the set was distributed to the public, and several years before Mrs. Gillham's injury, Admiral was informed that its transformers were causing fires that the safety device was not containing. In spite of this knowledge, and its additional knowledge that its sets were catching fire even when not in use, Admiral neither redesigned the set nor informed purchasers and prospective purchasers of the hazard. It not only continued to distribute the sets, but also misled customers by informing them that the sets were safe.

Accordingly, we conclude that the district court erred in granting the judgment *n. o. v.* The district court although concluding that Admiral admittedly was "grossly negligent," believed that its conduct did not show malice. The district court, however, does not sit as trier of fact *de novo*; its function in deciding this motion for judgment *n. o. v.* was limited to determining whether a reasonable person could arrive at the conclusion agreed upon by the jury. We hold that the jury could reasonably draw the requisite inference of malice from Admiral's conduct. Therefore its award of punitive damages and attorneys' fees was proper under Ohio law.

Reversed and remanded with instructions to enter judgment on the verdict. Costs to appellant.

---

4. Application of the rule that punitive damages may be awarded against a tortfeasor who acts in reckless indifference to the safety of others is illustrated in *Gearhart v. Angeloff,* 17 Ohio App.2d 143, 244 N.E.2d 802 (1969). In that case, a co-owner of a bar sought to evict an unruly patron, and when a scuffle ensued, the other co-owner fired a gun in the direction of the unruly patron and mistakenly grazed the arm of an innocent patron. In affirming the award of punitive damages, the court held, in its syllabus, that "[p]unitive damages may be recovered in an action for negligence where such negligence is so gross as to show a reckless indifference to the rights and safety of other persons." 17 Ohio App.2d 143, 244 N.E.2d 803. In this appeal, we observe that the district court, in its order granting the motion for the judgment *n. o. v.,* admitted that the evidence could support a conclusion that Admiral had adopted a "cavalier" attitude toward the public safety.