MALONE et al., Appellants,

v.

COURTYARD BY MARRIOTT LIMITED PARTNERSHIP et al., Appellees.

[Cite as *Malone v. Courtyard By Marriott L.P.* (1994), 95 Ohio App.3d 74.]

Court of Appeals of Ohio,
Franklin County.

No. 93APE10–1407.

Decided May 17, 1994.

*Lane, Alton & Horst, Gregory D. Rankin* and *Patrick H. Boggs,* for appellants.
*Squire, Sanders & Dempsey, David J. Young* and *Scott Pfahl,* for appellees.

TYACK, Judge.

On September 18, 1990, Lolita Malone and Karen Linda Meador filed a complaint in the Franklin County Court of Common Pleas, naming as defendants, *inter alia,* the Courtyard By Marriott Limited Partnership, d.b.a. Courtyard by Marriott ("Marriott"), and Vincent Gatewood. The complaint alleged that the defendants were liable in damages based on various tort theories as a result of Gatewood raping the two women during their stay at the Marriott hotel in Blue Ash, Ohio, during the early morning hours of July 22, 1989.

A jury trial ultimately commenced on June 21, 1993. At the close of the evidence, Marriott moved for a directed verdict as to all of the plaintiffs' claims. The trial court overruled the motion as to all claims except punitive damages. The court found that there were no genuine issues of fact as to whether Marriott's conduct could be the proper basis for a punitive damages award and, therefore, dismissed both plaintiffs' claims for punitive damages.

On June 29, 1993, the jury rendered a general verdict in favor of Marriott as to the claims of plaintiff Lolita Malone. With respect to plaintiff Karen Linda

Meador, however, the jury rendered a general verdict in her favor and awarded her compensatory damages in the amount of $300,000. The trial court journalized the jury's verdict and the disposition of the motion for directed verdict in a judgment entry filed July 19, 1993.

On July 7, 1993, Marriott filed a motion for judgment notwithstanding the verdict or, in the alternative, new trial or remittitur as to the Meador verdict. In an entry journalized September 13, 1993, the trial court granted Marriott's motion for a new trial and, accordingly, overruled the motions seeking alternative relief. In sustaining the motion for new trial, the trial court found the verdict was against the manifest weight of the evidence and that the award of damages was excessive. Therefore, the court vacated the judgment entry of July 19, 1993 as to Meador and ordered a new trial as to her claims.

The plaintiffs have timely appealed, assigning four errors for our consideration:

"Assignment of Error No. 1

"The trial court erred in granting a directed verdict in favor of defendants-appellees and against plaintiffs-appellants with respect to count III of the original complaint and amended complaint since there existed genuine issues of material fact as to whether the conduct of defendants-appellees was willful, wanton, reckless, and malicious, entitling plaintiff-appellant Meador to punitive damages and plaintiff-appellant Malone to compensatory and punitive damages.

"Assignment of Error No. 2

"The trial court erred in granting a new trial in favor of defendants-appellees and against plaintiff-appellant Karen Linda Meador under Ohio Civil Rule 59(A)(4) on the ground that the jury's damage award was excessive.

"Assignment of Error No. 3

"The trial court erred in granting a new trial in favor of defendants-appellees and against plaintiff-appellant Karen Linda Meador under Ohio Civil Rule 59(A)(6) on the ground that the jury's verdict was not sustained by the weight of the evidence.

"Assignment of Error No. 4

"The trial court erred in refusing to permit plaintiffs-appellants to use demonstrative evidence in closing argument."

The assignments of error and the parties' various and conflicting recitations of facts adduced at trial compel us to conduct a detailed examination of the record. Our review of the transcript of proceedings reveals the following pertinent testimony regarding the occurrences at the Marriott during the late evening of July 21 and early morning hours of July 22, 1989.

Plaintiffs called as their first witness Brian V. Record, national claims examiner for the Marriott International Corporation, to testify as on cross-examination. He testified that the "safety and well-being" of Marriott guests "is of paramount importance" to Marriott and that Marriott "has the responsibility to reasonably insure the safety and security of all hotel guests." He acknowledged that every Marriott employee who is on notice that a guest is in danger has a duty to respond "in a reasonable fashion to deal with that danger."

Plaintiff Lolita Malone testified as to her recollection of the events of July 21 and 22, 1989, when she and Karen Linda Meador checked into the Marriott hotel. On July 21, 1989, she and Meador traveled from their homes in Columbus to Cincinnati to attend the Kool Jazz Festival. Malone planned to meet up with her boyfriend, Brian Hood, at some point. He lived in South Bend, Indiana, at the time and he was supposed to attend the concert with a friend of his who lived in the Cincinnati area.

The two women checked into the Marriott at approximately 11:30 p.m. on Friday, July 21, 1989. As the women entered the hotel and neared the elevator, a man started up a conversation with them. Malone recalled him saying that he was an accountant in Cincinnati on business, and she felt that he was familiar with the area. The women asked the man if he knew the location of certain nightclubs. Malone had intended to try to meet up with her boyfriend, Brian Hood, at these nightclubs later.

Malone described the man, who later identified himself to them as Vincent Michaels, as being about six feet tall, two hundred twenty pounds, "unattractive" and "professionally" dressed. His demeanor was "very cordial * * * [v]ery personable. He seemed nice enough." "Michaels" was ultimately determined to be Vincent Gatewood.

Gatewood followed the women as they exited the elevator and entered their room, number 249. The conversation turned to the subject of a mutual friend of his and Malone's in St. Louis, where Gatewood said he lived. After approximately ten minutes in their room, Gatewood offered to go get some wine coolers, which offer the women accepted. He returned to their room shortly thereafter and the three of them drank wine coolers and talked.

At approximately 12:30 a.m., Meador answered a knock on their door. She told Malone that it was a security guard responding to a complaint about noise in their room. About ten minutes later, they asked Gatewood to leave their room so they could change their clothes before going out. Malone thought that he would be back soon to give them directions to the nightclubs they had been discussing. He returned at approximately 1:30 a.m., and suggested that the women go along with him in his car instead of him simply giving them directions. They declined his offer to go with him in his car. Instead, Malone explained that since they

"had just met him [and] didn't know him very well," she thought it would be best if they just followed him in her car. Malone testified that, earlier in the evening, she had left a message for her boyfriend on his friend's answering machine. When she left the hotel, she still hoped to meet up with Hood later that evening.

The women drove in Malone's car, following Gatewood in his car, to three nightclubs, but they never actually went into the clubs. The first one was closed when they arrived. They "felt the crowd was too young * * * [and] somewhat rowdy" at the second club, and they did not like the crowd at the third club either. Therefore, they returned to the hotel, arriving there at approximately 3:30 a.m.

When they arrived back at the hotel, Gatewood once again followed them to their room. Although the women hinted around that they were tired and would like for him to leave, Gatewood continued to talk and offered to go get more drinks. He persisted, and finally Malone reluctantly agreed to allow him to get more drinks. Despite his persistence, she had not become fearful of him by this time.

He returned to the women's room, and Malone drank half of a wine cooler. She did not believe that Meador had any. When Gatewood left to get the drinks, Meador had changed into an "oversized dorm shirt" and gotten into bed. Malone did not change her clothes for bed because she planned to go back out and meet her boyfriend, who phoned her right after Gatewood had returned with the drinks at approximately 3:45 a.m. It was her understanding from that telephone conversation that she was to meet Hood at his friend's house. Initially, Meador said that she did not want to go with Malone to meet Hood. She changed her mind, however, after Gatewood leaned over her in bed and whispered something in her ear.

Meador got out of bed and asked Gatewood to leave so that she could change her clothes to go out again. He "wasn't very cooperative with her" and she became "adamant about him leaving." Their voices grew louder, and he approached Meador. Malone stepped between them because she "got the feeling that he was going to try to hurt her." Malone coaxed him away from Meador and out the door, and he "seemed to be calmed down at that point." Shortly thereafter, Gatewood began shouting obscenities in the hallway. Malone heard him say "something like there's some bitches in room 249." He then threw something at their door which resulted in a "loud crash."

Meador soon realized that she had misplaced her card key for the room and they "got the feeling that maybe Mr. Gatewood had it." Malone testified that Meador may have handed her card key to Gatewood for him to open the door when they returned to the room earlier. The women discovered the following day that the card key had actually been misplaced.

Malone cracked the door open and asked Gatewood if he had her friend's card key. For the first time, Gatewood displayed anger toward Malone directly and "rushed the door." Before she could close it, he forced his way in and Malone screamed as he approached her. He began strangling her, and Meador tried to help get him off her. He turned, Meador fell down, and Malone "ran out the door screaming down the hallway." She testified that her immediate thought was "to try to get an elevator so that [she] could find the lobby and get some help."

As she waited for the elevator, Gatewood grabbed her from behind, shoved her into his nearby room, number 237, and knocked her to the floor. At this point, she could hear Meador running toward his room and screaming for help in the hallway. As Gatewood's door closed, Meador was thrown onto the floor on top of Malone. According to Malone, the two women were "screaming and pleading for help" because "he said he was going to kill us." He was yelling and threatening to throw Meador "over the balcony and splatter her face all over the cement."

Although she never saw a gun, Gatewood's actions in walking to the closet and unzipping a duffel bag led Malone to conclude that he had a gun. The women were desperate and even offered to pay him money to let them go.

Gatewood proceeded to rip the women's clothes off, throw them onto the bed, and rape both of them. Malone testified that he penetrated her vaginally and then penetrated Meador vaginally. Malone attempted to escape once while Gatewood was raping her friend. He forced Malone back down and tried to suffocate her with a pillow.

Malone estimated that the assaults began at approximately 4:00 a.m., based on her estimate that it was about fifteen minutes after her boyfriend had called her. The assaults also included him performing oral sex on the women. According to Malone, he indicated that the women could "tell the police * * * [and] they're never going to find anything" because he did not ejaculate inside either of them.

Malone testified that she pretended to fall asleep after Gatewood asked her to fondle him. The ordeal lasted approximately three hours, and they left his room at approximately 7:00 a.m. He agreed to let them go when Malone told him that they had friends coming over who would be suspicious if they were not there.

The women went to the lobby, obtained a card key for their room, and went back to their room without reporting the attack to anyone at the front desk. Malone explained that she and Meador were "in shock." Further, Gatewood had threatened that his family members in Columbus "would get [them]" if they went to the police.

The women immediately drove to the hospital, where they were examined by a physician and interviewed by a social worker, Jean Reed.

A police officer escorted the women back to the Marriott, where they showered and changed clothes to go to the police station. Meador checked them out of the hotel.

Malone testified that she has suffered depression as a result of the rape, and contacted the Rape Crisis Center several times. At the time of trial, she had been tested for AIDS approximately three times and received counseling from the Columbus Health Department. The possibility of eventually testing positive for the AIDS virus is a source of great stress and anxiety for Malone.

In describing "any * * * other trauma" which she has suffered as a result of the rape, Malone testified that she does not trust anyone anymore. She feels "very distant, very cold and bitter * * *[,] like a social cripple." She also suffers "flashbacks" of the incident and suffers guilt, shame and a shaken religious faith.

On cross-examination, Malone acknowledged that when she and Meador first met Gatewood near the elevator, he said something like "I've died and gone to heaven," and that she "understood that as a come-on, or a flirty-type of remark." She also acknowledged having testified at a prior proceeding that she thought it had been "highly inappropriate" for the security guard to have disturbed them at 12:30 a.m. when, in her opinion, they (she, Meador, and Gatewood) had not been noisy enough to warrant such a disruption.

Malone testified that the only "professionals" with whom she had consulted regarding this incident were persons at the Rape Crisis Center (their names and professional capacities unknown to her), a man at the Columbus Health Department, a social worker at the hospital, and a pastor she found listed in the phone book.

Malone also acknowledged on cross-examination that she testified during prior proceedings that Meador had given her card key to Gatewood and he used the key to access their room. She also admitted that she and Meador, despite their apprehensions about getting into a car with a man they had just met, did get into his car briefly when he gave them a ride to where she had parked at one of the nightclubs.

Malone testified that she and Meador did not utilize certain safety devices in their hotel room when Gatewood became noticeably hostile. Specifically, they did not use the dead bolt lock, bar latch, or peephole on their door. She could not recall whether she knocked on any doors as she went screaming down the hall toward the elevator.

Plaintiff Karen Linda Meador's testimony was substantially similar to Malone's. She did, however, add a few details regarding the events of that evening.

Meador elaborated on the conduct of Gatewood, referred to by Malone, when he whispered in Meador's ear after she had gone to bed. She confirmed that

Malone's boyfriend had phoned and wanted the two women to meet him at his friend's house. According to Meador, Gatewood whispered, "why don't you stay here, let her go out." She became "very uncomfortable with that notion," which prompted her to change her mind about going out. Gatewood's demeanor then changed dramatically and he became angry and hostile.

Meador's account of the assault was consistent with Malone's. Meador added that during the initial part of the attack, she attempted to help her friend, who was being strangled by Gatewood. He turned his attention to Meador, striking her in the mouth with his fist. She heard her friend screaming down the hallway, so Meador reacted by running after them. He ultimately grabbed Meador, threw her up against the wall, and she landed on top of Malone on the floor. As Malone stated, Meador testified that he threatened to kill them. Meador recalled that she might have "mentioned paying him * * * to get out of the room." Meador testified that he penetrated her vaginally only to the extent that he "jammed his penis at the opening of [her] vagina," possibly in response to her plea that she was "not on birth control." He fully penetrated her orally.

In all pertinent respects, her direct testimony mirrored Malone's, including the extent to which she sought and obtained professional treatment and counseling afterward. On cross-examination, Meador acknowledged that she, like Malone, did not receive any treatment from a physician, psychiatrist or psychologist following the initial treatment at the hospital immediately after the attack, aside from AIDS testing at the Columbus Health Department.

Meador acknowledged on cross-examination that she asked for and received a refund when she checked out of the hotel the following day, telling the hotel clerk that they had not stayed in their room that night.

Plaintiffs called as their next witness John R. Webster, former general manager of the Marriott in Blue Ash, to testify as on cross-examination. He agreed that one of the most important aspects of his job was "affording safe and secure lodging" for Marriott guests and that that responsibility was shared by all Marriott employees.

Webster identified plaintiffs' exhibit No. 7 as "a Courtyard Security Guideline" and exhibit No. 8 as a document setting forth "a guideline" for procedures to be followed in responding to "noise complaints." He could not think of any situation where he would not send someone to a guest room to check on a noise complaint lodged by another guest. He agreed that a call suggesting violence or that a guest was being harmed should trigger a more immediate, higher priority response.

Webster testified that he hired a twenty-one-year-old man named Chris Letkiewicz for "special event" security duties for the weekend of the jazz festival,

during which the hotel could be expected to have a "party-like" atmosphere. In his capacity as general manager, Webster was responsible for familiarizing such personnel with the hotel's security guidelines. Webster testified that he did have such discussions regarding Letkiewicz's duties with him.

In addition to Letkiewicz, other employees on duty during the pertinent time period included twenty-one-year-old Valerie Bengtson, the "night auditor" who was "in charge of the hotel," and Mike Hajjole, a twenty-one-year-old "night houseman" who performed odd jobs and generally "made rounds" throughout the hotel. If Letkiewicz was not available to respond to a security call, Hajjole, a foreign national, "would have taken over the responsibility." If Hajjole could not be reached via the two-way radio "he always carried," Bengtson's job would have been to call the complaining guest's room to attempt to identify the problem.

Webster acknowledged that Marriott's security guidelines provide that if the front desk is notified of a dangerous situation such as fighting, there should be an immediate response to and continued monitoring of the area.

Michael D. Macke testified via videotaped deposition on behalf of the plaintiffs. Macke and his wife and children were guests at the Marriott on July 21 and 22, 1989, staying in room number 247 next to the plaintiffs' room. At approximately 1:30 a.m., on July 22, 1989, at his wife's urging, Macke called the front desk to complain about noise. At about 3:30 a.m., he was awakened by more noise, specifically a "loud or * * * sudden thud against the wall" separating their room from the one next door. He believed that the "loud thud" he heard denoted an "[un]friendly atmosphere." He called the front desk a second time, explaining to whom he spoke that "something had happened, * * * someone might be getting hurt * * * and they ought to come up and check it out."

Approximately one hour later, he called the front desk a third time because his wife told him she "thought she heard someone screaming" and he heard what he thought was "someone running down the hall." During this third call, he told the front desk that "someone might need assistance" and he was again told "we'll send someone up." According to Macke, after all three of his calls, he heard knocking on doors nearby which he believed were security guards responding to his complaints.

Macke's wife, Leslie Macke, also testified via videotaped deposition on behalf of the plaintiffs. She was awakened during the early morning hours of July 22, 1989 by a "very hard slam of the door * * * and a lady screaming very loudly, * * * like she was being very badly hurt." She then heard what "sounded like a body * * * being thrown up against the * * * wall." This so startled her that she "got out of bed and ran to the other side of the room because [she] thought the person was going to come through the wall." She did not recall hearing earlier that evening any "party noise" from the plaintiffs' room adjacent to theirs.

Macke also heard screams coming from the plaintiffs' room at or near the same time she heard the loud thud. She believed that "someone was in trouble." She heard her husband phone the front desk to report the problem. Macke soon heard another door slam and "a girl or girls * * * scream for help running down the hallway." Macke testified that "that is when [her husband] got on the phone again and said, 'now the girl is screaming in the hallway for help.'" When they left the hotel the next morning, Macke saw a Blue Ash police car out in front of the hotel. She commented to her husband "that it's a little late for the Marriott to do anything now, since they couldn't get them there last night."

On cross-examination, Macke testified that she did not know whether security or other hotel personnel ever came up after her husband's second and third calls. On redirect examination, she clarified that she never heard a security guard knock on any of the doors and never heard any phone calls being made to any nearby rooms.

Eunela Williams and her husband were also guests of the Marriott that evening. She testified, via videotaped deposition, that she too was awakened "around four o'clock that morning * * * by a loud thump, bump or boom, like somebody had been—had fell or dropped something." She then heard a "lady screaming" and then a male voice. The woman was "calling his name, Vincent." According to Williams, she "could hear her say that he had her here and she asked him if she was—if he was going to kill her * * *." Williams called the front desk and requested that a security guard be sent up "because they were fighting." Williams indicated that her room number was 239 and the male who answered responded "okay" to her request for a guard to investigate.

Williams testified that she believed she only called the front desk once. She acknowledged providing a statement to police on July 22, 1989, which indicated that she had made two calls to the front desk earlier that day. With her memory refreshed, she then testified that she did make two calls to the front desk.

Williams also recalled the woman saying, "why are you doing this to us[?] What do you want? I'll pay you * * *." After her calls to the front desk, things quieted down, but she did not know whether anyone came up to the floor to investigate.

Letkiewicz also testified via videotaped deposition, called as a witness by the plaintiffs as on cross-examination. Letkiewicz denied that John Webster ever reviewed with or provided him any written security policies of the Marriott. In fact, Letkiewicz had spoken to Webster on only one occasion, and that was approximately one year prior to this incident. Letkiewicz had worked for the hotel on one prior occasion in 1988. Letkiewicz denied that any Marriott employee had ever reviewed security policies with him and denied that Marriott ever provided him any training. No one ever gave him instructions, written or

verbal, as to proper procedures for responding to noise and/or any other guest complaint.

Letkiewicz's shift at the Marriott was to begin at 11:00 p.m. on July 21 and end at approximately 4:00 the following morning. He did not wear a security guard uniform or any type of badge or identification.

To the best of Letkiewicz's knowledge, Valerie Bengtson would have received any phone complaints at the front desk during his shift. He did not directly receive any complaints over the phone. At approximately midnight, Bengtson told him that someone from room number 247 called to complain of noise coming from next door. He went upstairs, listened outside in the hallway, and returned shortly thereafter to the lobby because he did not hear any loud noise. A second call from room number 247 came in to Bengtson at approximately 12:15 or 12:30 a.m., with the caller complaining that the noise was continuing. According to Letkiewicz, he went back up to the area of room numbers 247 and 249. This time, the noise from room number 249 was loud enough, in his opinion, to warrant knocking on the door and requesting that they keep it down.

The third call from room number 247 came in about 3:30 a.m., according to Letkiewicz. Bengtson told him that she had received a complaint regarding an argument and noise sounding like something was being thrown against the wall. He stood outside room number 245 for five or ten minutes. He did not stand outside room numbers 237 or 249. When he did not hear any suspicious noise, he returned to the lobby. He remained in the lobby for about five minutes and then left the hotel at approximately 4:05 a.m. To the best of his knowledge, the three phone calls he responded to came from room number 247 and he never responded to any calls made from room number 239.

The plaintiffs called as their next witness Detective John D. Ladd of the Blue Ash Police Department. Ladd responded to the call from the hospital where the plaintiffs went for treatment on July 22, 1989. During the course of his investigation, he participated in the interviews of the plaintiffs, witnesses, and Marriott employees. No Marriott employee told him that Letkiewicz or anyone else responded to calls from room number 239 (the Williams' room). All of Letkiewicz's responses were made to room number 247 (the Mackes' room).

Plaintiffs' final witness was Dr. Bonnie L. Katz, a clinical psychologist retained by them for evaluation and assessment of the psychological impact the rapes had on them. Katz diagnosed both plaintiffs as suffering from post-traumatic stress disorder caused, in her professional opinion, by the rapes. The plaintiffs' symptoms included the inability to trust others, general anxiety, depression, lack of self-confidence, and loss of spiritual faith. Katz testified that these character-istics were typical of "acquaintance rape" victims. Further, both plaintiffs experienced difficulty in establishing or maintaining social relationships and in

maintaining consistent employment for which they were educated and trained. As to a prognosis for "recovery," Katz explained that a rape victim does not "get over" the trauma; instead, she must try to "get through" the psychological trauma as time passes.

Marriott called Brian Hood as its first witness. Hood recalled phoning Malone at approximately 3:45 a.m. on July 22, 1989, at her Marriott hotel room. He acknowledged that, in a deposition in April 1992, he testified that he recalled telling her that he would come over to the Marriott to see her. During their phone conversation, Malone did not tell him that Gatewood was in their room.

Hood testified that he went to the Marriott, called up to Malone's room, and then waited unsuccessfully to see her. When he did ultimately see both women later that evening, he noticed no physical injuries to either woman.

On cross-examination, Hood testified that it was possible that there might have been a "miscommunication" as to where he was supposed to meet up with Malone that early morning.

Marriott's second witness was Jean Reed, the social worker who interviewed the plaintiffs at the hospital after the rapes. On direct examination, she testified as to her recollection of the information provided to her at the time by the plaintiffs. Generally, the events surrounding the sexual assault as recited by the plaintiffs to Reed were consistent with their trial testimony. On cross-examination, Reed testified that she observed physical injuries to both women, including scratches and bruises. In addition, Meador had a cut on her lip.

Marriott's third and final witness was Michael Macke. As he and his wife earlier testified in their videotaped depositions, the Macke family stayed in room number 247 on the night of the assault. He disagreed with his wife's testimony as to the location of the plaintiffs' room in relation to room number 247. While Macke stated that the plaintiffs' room was adjacent to the wall against which the Mackes' headboard was located, Macke testified that that adjacent room would have actually been room number 245.

Macke testified that he called the front desk at approximately 3:30 a.m., after being awakened by his wife and hearing "some type of large thud" against the wall. He told the person at the front desk "that there was something going on in the next room, that they might want to come up and please check it out * * *." Macke heard no more noises immediately following his call.

Macke testified that his next phone call to the front desk was at approximately 4:30 a.m. Hearing "a female running down the hall" prompted this call to the front desk.

On cross-examination, Macke recalled a statement he had provided earlier regarding his first call to the front desk at approximately 1:30 a.m. to complain

about "party noises." During that first phone call, he initially spoke with a female who "was kind of * * * frustrated * * *, like they really didn't know what they were supposed to do." Further, the woman "said they couldn't account for their guests [and] there wasn't much that anyone could do." She "quickly put [him] on hold * * * " and he then spoke with a male voice who he guessed was the night manager. When he called the second time at around 3:30 a.m., the person with whom he spoke was not the "frustrated" woman with whom he had earlier spoken.

Macke further acknowledged saying in his earlier statement that in addition to the "thud" against the wall, he also heard "a lot of noises, a lot of door banging * * * lots of shouts * * * and a lot of angry words." Finally, Macke acknowledged saying earlier that "[i]t sounded like she was being hurt or being accosted or being beat."

As indicated above, at the close of the evidence, the trial court granted Marriott's motion for a directed verdict on the issue of punitive damages.

■ In their first assignment of error, plaintiffs argue that the trial court erred in directing a verdict in favor of Marriott on the issue of punitive damages, since there existed genuine issues of material fact as to whether Marriott's conduct was reckless or malicious.

Civ.R. 50(A)(4) provides the standard which shall guide a trial court in ruling on a motion for a directed verdict made at the close of the evidence. It reads:

"When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue."

In *Strother v. Hutchinson* (1981), 67 Ohio St.2d 282, 284–285, 21 O.O.3d 177, 179, 423 N.E.2d 467, 469, the Supreme Court of Ohio stated:

"When considering a motion for a directed verdict, a trial court must construe the evidence most strongly in favor of the party against whom the motion is directed. * * *

" * * * *

" * * * [T]he court must neither consider the weight of the evidence nor the credibility of the witnesses in disposing of a directed verdict motion. * * * Thus, 'if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied. *Kellerman v. J.S. Durig Co.* (1964), 176

Ohio St. 320 [27 O.O.2d 241, 199 N.E.2d 562] * * *.' *Hawkins v. Ivy* (1977), 50 Ohio St.2d 114, 115 [4 O.O.3d 243, 244, 363 N.E.2d 367, 368]." See, also, *Humphrey v. Dent* (1980), 62 Ohio St.2d 273, 275, 16 O.O.3d 321, 322, 405 N.E.2d 284, 286–287, and *Posin v. A.B.C. Motor Court Hotel* (1976), 45 Ohio St.2d 271, 275, 74 O.O.2d 427, 429–430, 344 N.E.2d 334, 338.

■ In order to recover punitive damages, a plaintiff must prove that the defendant acted with "actual malice." *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174. The syllabus to *Preston* defines "actual malice" as:

" * * * (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, *or* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis *sic*.)

Appellants argue that the trial court abused its discretion because, construing the evidence most strongly in favor of the plaintiffs, there was substantial competent evidence upon which reasonable minds could differ as to whether Marriott's conduct constituted a conscious disregard for the plaintiffs' safety which had a great probability of causing substantial harm. We agree.

Construing the evidence most strongly in favor of the plaintiffs, reasonable minds could conclude that Marriott's failure to respond to numerous phone calls from several hotel guests, in which they informed Marriott that the plaintiffs were in imminent danger, constituted the requisite conscious disregard for the plaintiffs' safety. As noted above, there was testimony indicating that the Marriott employee was informed specifically that a man was threatening to kill someone. Certainly the testimony established sufficient evidence to create a jury question as to the "probability of causing substantial harm" element as well. We hold, therefore, that the trial court erred in directing a verdict in favor of Marriott as to punitive damages.

■ Marriott argues that if the trial court did err, then any error was harmless as to plaintiff Malone, whom the jury found to be fifty-one percent negligent. This argument corresponds with *Burwell v. Am. Edwards Labs.* (1989), 62 Ohio App.3d 73, 574 N.E.2d 1094, in which this court held:

" * * * Absent concurrent compensatory damages, punitive damages are inappropriate and do not constitute a cause of action in and of themselves. *Bishop v. Grdina* (1985), 20 Ohio St.3d 26, 20 OBR 213, 485 N.E.2d 704. Even if the issue had been submitted to the jury, given the verdict, no punitive damages would have been awarded. Therefore, any error which may have been committed by the trial court affected no substantial right of appellants, and must be considered harmless error. * * * " *Id.*, 62 Ohio App.3d at 78, 574 N.E.2d at 1097.

If the liability of the defendants depended solely upon a negligence theory, then Malone might not recover. The testimony before the trial court could support the comparative negligence finding of the jury. However, if the liability of the defendants is based upon recklessness or maliciousness, comparative negligence is not a defense. See *Labadie v. Semler* (1990), 66 Ohio App.3d 540, 544, 585 N.E.2d 862, 864. As a result, the recklessness or maliciousness could form the basis for liability for both compensatory and punitive damages.

Since the trial court directed a verdict as to recklessness or maliciousness, the jury never had an opportunity to assess recklessness or maliciousness as a basis for liability. We believe that a reasonable jury could find the existence of recklessness or maliciousness, given the extensive evidence discussed above.

■ Marriott argues that the trial court's directed verdict is appropriate because the plaintiffs failed to demonstrate "that any of the named defendants participated in, authorized or ratified any alleged conduct on the part of the Blue Ash employees." Marriott cites *Foust v. Valleybrook Realty Co.* (1981), 4 Ohio App.3d 164, 4 OBR 264, 446 N.E.2d 1122, where the Wood County Court of Appeals held:

"A principal's liability for willful, wanton, and malicious acts of his agent does not extend to a liability in punitive damages unless the principal has authorized, ratified, acquiesced, or participated in the agent's conduct or failed to exercise due and reasonable care in selecting and retaining an employee." *Id.* at 168, 4 OBR at 168, 446 N.E.2d at 1128.

In *Moran v. Johns–Manville Sales Corp.* (C.A.6, 1982), 691 F.2d 811, the Sixth Circuit Court of Appeals explained that:

" * * * under Ohio law, a corporation may be 'subjected to punitive damages for the tortious acts of its agents within the scope of their employment in any case where a natural person acting for himself would be liable for punitive damages,'" *id.* at 816, citing *Gillham v. Admiral Corp.* (C.A.6, 1975), 523 F.2d 102, 108.

■ As a general rule, a corporation acts only through the acts of agents and employees. If the acts of the employees in particular are within the scope of employment, then those acts are the acts of the corporation. In most cases, the determination as to whether an employee was acting within the scope of his or her employment is a question of fact to be decided by the jury. *Osborne v. Lyles* (1992), 63 Ohio St.3d 326, 330, 587 N.E.2d 825, 829. In the present case, no evidence exists that any of the personnel on duty at the motel were acting outside the scope of their employment, so their acts and failure to act are the acts and failures of the corporation.

Taken in the extreme, appellees' argument would require that the board of directors of a corporation enter some sort of written notification of the egregious acts of its employees in the corporate minutes before the corporation could be found liable. We believe such a requirement would be against public policy. We also believe such a requirement is at odds with the current law of Ohio.

For the foregoing reasons, the first assignment of error is sustained.

■ Plaintiff Meador's second and third assignments of error contend that the trial court erred in granting Marriott's motion for a new trial. The trial court granted Marriott's motion pursuant to Civ.R. 59(A)(4) and (6), which provides:

"(A) * * * A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:

" * * *

"(4) Excessive or inadequate damages, appearing to have been given under the influence of passion or prejudice;

" * * *

"(6) The judgment is not sustained by the weight of the evidence * * *."

Thus, the trial court determined that the jury awarded plaintiff Meador excessive damages and that the verdict was not sustained by the weight of the evidence. The trial court reasoned that the $300,000 award was "clearly excessive" because "it was Malone who suffered the majority of Gatewood's assault," and because of the lack of evidence as to damages. In concluding that the verdict was against the manifest weight of the evidence, the trial court briefly summarized its interpretation of what the evidence established: the plaintiffs allowed Gatewood in their room after going out to several bars; Meador had "several opportunities" to call security or other law enforcement and failed to do so; and, finally, Marriott personnel did respond to calls but found matters quiet at the time.

■ We acknowledge that the decision to grant a motion for a new trial rests within the sound discretion of the trial court, and that ruling will not be disturbed by a reviewing court absent a showing that the trial court abused its discretion. *Verbon v. Pennese* (1982), 7 Ohio App.3d 182, 7 OBR 229, 454 N.E.2d 976; *Jeanne v. Hawkes Hosp. of Mt. Carmel* (1991), 74 Ohio App.3d 246, 598 N.E.2d 1174. "Abuse of discretion," in sustaining a motion for a new trial, connotes an "unreasonable, arbitrary or unconscionable attitude upon the part of the court." *Poske v. Mergl* (1959), 169 Ohio St. 70, 75, 8 O.O.2d 36, 39, 157 N.E.2d 344, 348. A trial court abuses its discretion when it grants a new trial following a jury verdict where there is substantial evidence to support the verdict. *Verbon, supra*, 7 Ohio App.3d at 184, 7 OBR at 231, 454 N.E.2d at 979.

In *Litchfield v. Morris* (1985), 25 Ohio App.3d 42, 44, 25 OBR 115, 117–118, 495 N.E.2d 462, 464, this court held that "[i]n the absence of prejudice neither this court nor the trial court can substitute its judgment for that of the jury in the area of damages in a personal injury case." A jury's verdict should not be set aside " 'unless the damages awarded are so excessive as to appear to have been awarded as a result of passion or prejudice, or unless it is so manifestly against the weight of the evidence as to show a misconception by the jury of its duties * * *.' " *Id.* at 44, 25 OBR at 115, 495 N.E.2d at 464, quoting *Toledo, Columbus & Ohio River RR. Co. v. Miller* (1923), 108 Ohio St. 388, 140 N.E. 617, paragraph three of the syllabus.

We find that the trial court abused its discretion in this case because there was substantial evidence to support the jury's verdict in favor of Meador and the damages were not in any way the product of passion or prejudice.

There was substantial evidence to support the jury's finding that Marriott should be held liable for its negligence in failing to respond to numerous phone calls alerting Marriott to the plaintiffs' plight. As outlined in detail above, there was ample testimony indicating that guests called the front desk to report the crime-in-progress, and that Marriott employees failed to respond. The jury could reasonably conclude, as they apparently did, that no Marriott security personnel were available to respond after Letkiewicz left the premises shortly after 4:00 a.m. The jury could reasonably decide that it was unreasonable and even reckless for the Marriott employee who received the phone calls not to have contacted law enforcement to address an emergency to which it had been alerted and apparently was not able or willing to handle appropriately.

The jury also could have reasonably decided that, although Meador perhaps could have taken advantage of "several opportunities" to call security or the police, it was not unreasonable for her to have gone to the immediate aid of her friend.

Similarly, the jury's award of $300,000 in compensatory damages was not so excessive as to justify a finding that it was "awarded as a result of passion or prejudice." As set forth above, Dr. Katz testified that Meador suffers from post-traumatic stress disorder and is unlikely to "recover" from the effects of the trauma in the near future, if indeed she ever does.

The trial court's finding that Malone "suffered the majority of Gatewood's assault" is simply not supported by the record. This erroneous factual finding was exacerbated by the trial court's comparison of the damages suffered by both plaintiffs. Each plaintiff's respective damages should be evaluated independently.

The second and third assignments of error are sustained.

In their fourth assignment of error, the plaintiffs argue that the trial court erred in refusing to allow them to use a piece of demonstrative evidence during closing argument. This item was a "timeline" chart which set forth plaintiffs' assessment of the chronology of significant events surrounding the assaults. Plaintiffs had referred to the chart throughout the trial, but they did not move to admit it as an exhibit until the issue arose immediately before closing argument. For this reason, and because the trial court deemed the chart merely a "summary as to the [p]laintiffs' view" as to what they believed the evidence showed, the court held that it would not be admitted into evidence nor used during closing argument. The court did allow plaintiffs' counsel to recreate the timeline on a blackboard for using during closing argument.

A ruling of the trial court determining that certain evidence will be admitted or excluded from trial will not be reversed absent a showing of a clear and prejudicial abuse of discretion. *O'Brien v. Angley* (1980), 63 Ohio St.2d 159, 163, 17 O.O.3d 98, 100, 407 N.E.2d 490, 493; *Sedgwick v. Kawasaki Cycleworks, Inc.* (1991), 71 Ohio App.3d 117, 127, 593 N.E.2d 69, 75. We find that plaintiffs have not demonstrated error, much less prejudicial error. They did not timely move for admission of the exhibit into evidence. Further, counsel was permitted to place the same information before the jury via the blackboard.

The fourth assignment of error is overruled.

In summary, the first, second and third assignments of error are sustained. The fourth assignment of error is overruled.

The judgments of the Franklin County Court of Common Pleas directing a verdict as to the claim for punitive damages and granting Marriott a new trial are reversed. This cause is remanded to the trial court with instructions to reinstate the jury's verdict as to Meador, to conduct a new trial as to compensatory damages on a theory of recklessness as to Malone, and to conduct appropriate proceedings for a determination as to punitive damages.

*Judgment reversed and*
*cause remanded with instructions.*

BOWMAN, J., concurs.

CLOSE, J., dissents.

CLOSE, Judge, dissenting.

In order to survive a directed verdict, appellants here must have shown that appellees acted with "actual malice." There is no question that appellants presented no evidence on the first prong of the test in *Preston v. Murty* (1987), 32 Ohio St.3d 334, 512 N.E.2d 1174.

Pursuant to the majority opinion, the second prong was met in that there was a showing of "conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Preston, supra.* While it is very clear that a jury could have found negligence on the part of Marriott, the uncontroverted testimony showed that (1) there was not a conscious disregard for rights by virtue of the security measures in place; and (2) there was no showing that there was a great probability of causing substantial harm. Failure on either one of those issues would be sufficient to allow the directed verdict. The failure of any evidence at all on either made the decision of the trial court proper. While acknowledging that the evidence must be construed most strongly in appellants' favor, when there is no evidence and the uncontroverted evidence is to the contrary, a directed verdict is proper.

I additionally cannot concur with the reversal of the granting of a motion for a new trial pursuant to Civ.R. 59(A)(6). The trial court decided the evidence presented in making its decision and, in particular, found the verdict to be against the manifest weight of the evidence. The standard, as properly indicated by the majority, is "an abuse of discretion." That, of course, requires that the decision of the trial court be "unreasonable, arbitrary or unconscionable." While it may be that it is arguable whether or not the trial court should have granted a motion for a new trial, that is not the standard. The trial court was in a position to do the limited weighing that it is required to do in considering a motion for new trial and that decision should not be disturbed upon appeal.